# PELL ET AL. *v.* PROCUNIER, CORRECTIONS DIRECTOR, ET AL.

No. 73–918.   Argued April 16–17, 1974—Decided June 24, 1974*

---

*Together with No. 73–754, *Procunier, Corrections Director* v. *Hillery et al.*, also on appeal from the same court.

818

Stewart, J., delivered the opinion of the Court, in which Burger, C. J., and White, Blackmun, and Rehnquist, JJ., joined and in Part I of which Powell, J., joined. Powell, J., filed an opinion concurring in part and dissenting in part, *post,* p. 835. Douglas, J., filed a dissenting opinion, in which Brennan and Marshall, JJ., joined, *post,* p. 836.

*Herman Schwartz* argued the cause for appellants in No. 73–918. With him on the briefs were *Alvin J. Bronstein* and *Melvin L. Wulf.*

*John T. Murphy,* Deputy Attorney General of California, argued the cause for appellees in No. 73–918 and for appellants in No. 73–754. With him on the briefs were *Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *Edward P. O'Brien,* Assistant Attorney General, and *Jean M. Bordon,* Deputy

Attorney General. *Stanley A. Bass* argued the cause for appellees in No. 73–754. With him on the brief were *Jack Greenberg* and *Charles Stephen Ralston.*†

MR. JUSTICE STEWART delivered the opinion of the Court.

These cases are here on cross-appeals from the judgment of a three-judge District Court in the Northern District of California. The plaintiffs in the District Court were four California prison inmates—Booker T. Hillery, Jr., John Larry Spain, Bobby Bly, and Michael Shane Guile—and three professional journalists—Eve Pell, Betty Segal, and Paul Jacobs. The defendants were Raymond K. Procunier, Director of the California Department of Corrections, and several subordinate officers in that department. The plaintiffs brought the suit to challenge the constitutionality, under the First and Fourteenth Amendments, of § 415.071 of the California Department of Corrections Manual, which provides that "[p]ress and other media interviews with specific individual inmates will not be permitted." They sought both injunctive and declaratory relief under 42 U. S. C. § 1983. Section 415.071 was promulgated by defendant Procunier under authority vested in him by § 5058 of the California Penal Code and is applied uniformly throughout the State's penal system to prohibit face-to-face interviews between press representatives and individual inmates whom they specifically name and request to interview.

---

†Briefs of *amici curiae* in No. 73–918 were filed by *Joseph A. Califano, Jr., Charles H. Wilson, Jr., Richard M. Cooper, Daniel P. S. Paul, James W. Rodgers,* and *Robert C. Lobdell* for the Washington Post Co. et al., and by *Glen E. Clover* and *Robert J. King* for the Houston Chronicle Publishing Co. *Don H. Reuben* and *Lawrence Gunnels* filed a brief for the Chicago Tribune Co. as *amicus curiae* in both cases.

In accordance with 28 U. S. C. §§ 2281 and 2284, a three-judge court was convened to hear the case.[1]

The facts are undisputed. Pell, Segal, and Jacobs each requested permission from the appropriate corrections officials to interview inmates Spain, Bly, and Guile, respectively. In addition, the editors of a certain periodical requested permission to visit inmate Hillery to discuss the possibility of their publishing certain of his writings and to interview him concerning conditions at the prison.[2] Pursuant to § 415.071, these requests were all denied.[3] The plaintiffs thereupon sued to enjoin the continued enforcement of this regulation. The inmate plaintiffs contended that § 415.071 violates their rights of free speech

---

[1] This litigation was first initiated before a single judge and proceeded for nearly a year with the court's attention focused on the interview practice at San Quentin State Penitentiary, where all the inmate plaintiffs are confined, where the interviews sought by the media plaintiffs were to occur, and where all the defendants, except Mr. Procunier, are employed. After the matter was briefed and argued, the single judge preliminarily enjoined the enforcement of § 415.071. Only then did the defendants bring to the court's attention that § 415.071 was a regulation of statewide application. Thereafter a three-judge court was convened to pass on the constitutional validity of the regulation.

[2] The periodical has since ceased publication and its editors did not join the media plaintiffs in this litigation.

[3] There is some question as to whether the interview between Hillery and the magazine editors was denied under the authority of § 415.071. Department of Corrections interview policy permits, on a case-by-case basis, meetings between inmate authors and their publishers. The defendants contend that the interview was denied here because the officials made an individualized determination that the meeting was not in fact necessary to effectuate the publication of Hillery's works. Hillery, on the other hand, notes that the editors had indicated to the prison officials that they also wished to discuss with him the conditions in the prison in order to publish an article on that subject. Thus, it appears that the denial was in all likelihood based at least in part on § 415.071.

under the First and Fourteenth Amendments. Similarly, the media plaintiffs asserted that the limitation that this regulation places on their newsgathering activity unconstitutionally infringes the freedom of the press guaranteed by the First and Fourteenth Amendments.

The District Court granted the inmate plaintiffs' motion for summary judgment, holding that § 415.071, insofar as it prohibited inmates from having face-to-face communication with journalists, unconstitutionally infringed their First and Fourteenth Amendment freedoms. With respect to the claims of the media plaintiffs, the court granted the defendants' motion to dismiss. The court noted that "[e]ven under § 415.071 as it stood before today's ruling [that inmates' constitutional rights were violated by § 415.071] the press was given the freedom to enter the California institutions and interview at random," and concluded "that the even broader access afforded prisoners by today's ruling sufficiently protects whatever rights the press may have with respect to interviews with inmates." 364 F. Supp. 196, 200.

In No. 73–754, Corrections Director Procunier and the other defendants appeal from the judgment of the District Court that § 415.071 infringes the inmate plaintiffs' First and Fourteenth Amendment rights. In No. 73–918, the media plaintiffs appeal the court's rejection of their claims. We noted probable jurisdiction of both appeals and consolidated the cases for oral argument. 414 U. S. 1127, 1155.

I

In No. 73–754, the inmate plaintiffs claim that § 415.071, by prohibiting their participation in face-to-face communication with newsmen and other members of the general public, violates their right of free speech under the First and Fourteenth Amendments. Although the constitutional right of free speech has never been

thought to embrace a right to require a journalist or any other citizen to listen to a person's views, let alone a right to require a publisher to publish those views in his newspaper, see *Avins* v. *Rutgers, State University of New Jersey,* 385 F. 2d 151 (CA3 1967); *Chicago Joint Board, Clothing Workers* v. *Chicago Tribune Co.,* 435 F. 2d 470 (CA7 1970); *Associates & Aldrich Co.* v. *Times Mirror Co.,* 440 F. 2d 133 (CA9 1971), we proceed upon the hypothesis that under some circumstances the right of free speech includes a right to communicate a person's views to any willing listener, including a willing representative of the press for the purpose of publication by a willing publisher.

We start with the familiar proposition that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price* v. *Johnston,* 334 U. S. 266, 285 (1948). See also *Cruz* v. *Beto,* 405 U. S. 319, 321 (1972). In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

An important function of the corrections system is the deterrence of crime. The premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses. This

isolation, of course, also serves a protective function by quarantining criminal offenders for a given period of time while, it is hoped, the rehabilitative processes of the corrections system work to correct the offender's demonstrated criminal proclivity. Thus, since most offenders will eventually return to society, another paramount objective of the corrections system is the rehabilitation of those committed to its custody. Finally, central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves. It is in the light of these legitimate penal objectives that a court must assess challenges to prison regulations based on asserted constitutional rights of prisoners.

The regulation challenged here clearly restricts one manner of communication between prison inmates and members of the general public beyond the prison walls. But this is merely to state the problem, not to resolve it. For the same could be said of a refusal by corrections authorities to permit an inmate temporarily to leave the prison in order to communicate with persons outside. Yet no one could sensibly contend that the Constitution requires the authorities to give even individualized consideration to such requests. Cf. *Zemel* v. *Rusk*, 381 U. S. 1, 16–17 (1965). In order properly to evaluate the constitutionality of § 415.071, we think that the regulation cannot be considered in isolation but must be viewed in the light of the alternative means of communication permitted under the regulations with persons outside the prison. We recognize that there "may be particular qualities inherent in sustained, face-to-face debate, discussion and questioning," and "that [the] existence of other alternatives [does not] extinguis[h] altogether any constitutional interest on the part of the appellees in this particular form of access." *Kleindienst* v. *Mandel*, 408

U. S. 753, 765 (1972). But we regard the available "alternative means of [communication as] a relevant factor" in a case such as this where "we [are] called upon to balance First Amendment rights against [legitimate] governmental . . . interests." *Ibid.*

One such alternative available to California prison inmates is communication by mail. Although prison regulations, until recently, called for the censorship of statements, *inter alia,* that "unduly complain" or "magnify grievances," that express "inflammatory political, racial, religious or other views," or that were deemed "defamatory" or "otherwise inappropriate," we recently held that "the Department's regulations authorized censorship of prisoner mail far broader than any legitimate interest of penal administration demands," and accordingly affirmed a district court judgment invalidating the regulations. *Procunier* v. *Martinez,* 416 U. S. 396, 416 (1974). In addition, we held that "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment." Accordingly, we concluded that any "decision to censor or withhold delivery of a particular letter must be accompanied by minimal procedural safeguards." *Id.,* at 418, 417. Thus, it is clear that the medium of written correspondence affords inmates an open and substantially unimpeded channel for communication with persons outside the prison, including representatives of the news media.

Moreover, the visitation policy of the California Corrections Department does not seal the inmate off from personal contact with those outside the prison. Inmates are permitted to receive limited visits from members

of their families, the clergy, their attorneys, and friends of prior acquaintance.[4]  The selection of these categories of visitors is based on the Director's professional judgment that such visits will aid in the rehabilitation of the inmate while not compromising the other legitimate objectives of the corrections system.  This is not a case in which the selection is based on the anticipated content of the communication between the inmate and the prospective visitor.  If a member of the press fell within any of these categories, there is no suggestion that he would not be permitted to visit with the inmate.  More importantly, however, inmates have an unrestricted opportunity to communicate with the press or any other member of the public through their families, friends, clergy, or attorneys who are permitted to visit them at the prison.  Thus, this provides another alternative avenue of communication between prison inmates and persons outside the prison.

We would find the availability of such alternatives unimpressive if they were submitted as justification for governmental restriction of personal communication among members of the general public.  We have recognized, however, that "[t]he relationship of state prisoners and the state officers who supervise their confinement is far more intimate than that of a State and a private

---

[4] This policy does not appear to be codified or otherwise expressly articulated in any generally applicable rule or regulation.  The statement of visiting privileges for San Quentin State Penitentiary indicates that all visitors must be approved by the corrections officials and must be either "members of the family or friends of long standing."  It also permits visits by attorneys to their clients.  Although nothing is said in this statement about visits by members of the clergy, there is no dispute among the parties that the practice of the Department of Corrections is to permit such visits.  There is also no disagreement among the parties that this visitation policy is generally applied by the Department throughout the state corrections system.

citizen," and that the "internal problems of state prisons involve issues . . . peculiarly within state authority and expertise." *Preiser* v. *Rodriguez,* 411 U. S. 475, 492 (1973).

In *Procunier* v. *Martinez, supra,* we could find no legitimate governmental interest to justify the substantial restrictions that had there been imposed on written communication by inmates. When, however, the question involves the entry of people into the prisons for face-to-face communication with inmates, it is obvious that institutional considerations, such as security and related administrative problems, as well as the accepted and legitimate policy objectives of the corrections system itself, require that some limitation be placed on such visitations. So long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved, we believe that, in drawing such lines, "prison officials must be accorded latitude." *Cruz* v. *Beto,* 405 U. S., at 321.

In a number of contexts, we have held "that reasonable 'time, place and manner' regulations [of communicative activity] may be necessary to further significant governmental interests, and are permitted." *Grayned* v. *City of Rockford,* 408 U. S. 104, 115 (1972); *Cox* v. *New Hampshire,* 312 U. S. 569, 575–576 (1941); *Poulos* v. *New Hampshire,* 345 U. S. 395, 398 (1953); *Cox* v. *Louisiana,* 379 U. S. 536, 554–555 (1965); *Adderley* v. *Florida,* 385 U. S. 39, 46–48 (1966). "The nature of a place, the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable." *Grayned, supra,* at 116 (internal quotation marks omitted). The "normal activity" to which a prison is committed—the involuntary confinement and isolation of large numbers of people, some of whom have demonstrated a capacity for violence—necessarily re-

quires that considerable attention be devoted to the maintenance of security. Although they would not permit prison officials to prohibit all expression or communication by prison inmates, security considerations are sufficiently paramount in the administration of the prison to justify the imposition of some restrictions on the entry of outsiders into the prison for face-to-face contact with inmates.

In this case the restriction takes the form of limiting visitations to individuals who have either a personal or professional relationship to the inmate—family, friends of prior acquaintance, legal counsel, and clergy. In the judgment of the state corrections officials, this visitation policy will permit inmates to have personal contact with those persons who will aid in their rehabilitation, while keeping visitations at a manageable level that will not compromise institutional security. Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters. Courts cannot, of course, abdicate their constitutional responsibility to delineate and protect fundamental liberties. But when the issue involves a regulation limiting one of several means of communication by an inmate, the institutional objectives furthered by that regulation and the measure of judicial deference owed to corrections officials in their attempt to serve those interests are relevant in gauging the validity of the regulation.

Accordingly, in light of the alternative channels of communication that are open to prison inmates,[5] we

---

[5] It is suggested by the inmate appellees that the use of the mails as an alternative means of communication may not be effective in

cannot say on the record in this case that this restriction on one manner in which prisoners can communicate with persons outside of prison is unconstitutional. So long as this restriction operates in a neutral fashion, without regard to the content of the expression, it falls within the "appropriate rules and regulations" to which "prisoners necessarily are subject," *Cruz* v. *Beto, supra,* at 321, and does not abridge any First Amendment freedoms retained by prison inmates.[6]

---

the case of prisoners who are inarticulate or even illiterate. There is no indication, however, that any of the four inmates before the Court suffer from either of these disabilities. Indeed, the record affirmatively shows that two of the inmates are published writers. Although the complaint was filed as a class action, the plaintiffs never moved the District Court to certify the case as a class action as required by Fed. Rules Civ. Proc. 23 (b)(3) and (c). Thus, the short answer to the inmates' contention is that there is neither a finding by the District Court nor support in the record for a finding that the alternative channels of communication are not an effective means for the inmate appellees to express themselves to persons outside the prison.

Even with respect to inmates who may not be literate or articulate, however, there is no suggestion that the corrections officials would not permit such inmates to seek the aid of fellow inmates or of family and friends who visit them to commit their thoughts to writing for communication to individuals in the general public. Cf. *Johnson* v. *Avery,* 393 U. S. 483 (1969). Merely because such inmates may need assistance to utilize one of the alternative channels does not make it an ineffective alternative, unless, of course, the State prohibits the inmate from receiving such assistance.

[6] The inmates argue that restricting their access to press representatives unconstitutionally burdens their First and Fourteenth Amendment right to petition the government for the redress of grievances. Communication with the press, the inmates contend, provides them with their only effective opportunity to communicate their grievances, through the channel of public opinion, to the legislative and executive branches of the government. We think, however, that the alternative means of communication with the press that are available to prisoners, together with the substantial access to prisons that Cali-

## II

In No. 73–918, the media plaintiffs ask us to hold that the limitation on press interviews imposed by § 415.071 violates the freedom of the press guaranteed by the First and Fourteenth Amendments. They contend that, irrespective of what First Amendment liberties may or may not be retained by prison inmates, members of the press have a constitutional right to interview any inmate who is willing to speak with them, in the absence of an individualized determination that the particular interview might create a clear and present danger to prison security or to some other substantial interest served by the corrections system. In this regard, the media plaintiffs do not claim any impairment of their freedom to publish, for California imposes no restrictions on what may be published about its prisons, the prison inmates, or the officers who administer the prisons. Instead, they rely on their right to gather news without governmental interference, which the media plaintiffs assert includes a right

fornia accords the press and other members of the public, see *infra,* at 830–831, satisfies whatever right the inmates may have to petition the goverment through the press.

We also note that California accords prison inmates substantial opportunities to petition the executive, legislative, and judicial branches of government directly. Section 2600 of the California Penal Code permits an inmate to correspond confidentially with any public officeholder. And various rules promulgated by the Department of Corrections explicitly permit an inmate to correspond with the Governor, any other elected state or federal official, and any appointed head of a state or federal agency. Similarly, California has acted to assure prisoners the right to petition for judicial relief. See, *e. g., In re Jordan,* 7 Cal. 3d 930, 500 P. 2d 873 (1972); *In re Van Geldern,* 5 Cal. 3d 832, 489 P. 2d 578 (1971); *In re Harrell,* 2 Cal. 3d 675, 470 P. 2d 640 (1970). Section 845.4 of the California Government Code also makes prison officials liable for intentional interference with the right of a prisoner to obtain judicial relief from his confinement.

of access to the sources of what is regarded as newsworthy information.

We note at the outset that this regulation is not part of an attempt by the State to conceal the conditions in its prisons or to frustrate the press' investigation and reporting of those conditions. Indeed, the record demonstrates that, under current corrections policy, both the press and the general public are accorded full opportunities to observe prison conditions.[7] The Department of Corrections regularly conducts public tours through the prisons for the benefit of interested citizens. In addition, newsmen are permitted to visit both the maximum security and minimum security sections of the institutions and to stop and speak about any subject to any inmates whom they might encounter. If security considerations permit, corrections personnel will step aside to permit such interviews to be confidential. Apart from general access to all parts of the institutions, newsmen are also permitted to enter the prisons to interview inmates selected at random by the corrections officials. By the same token, if a newsman wishes to write a story on a particular prison program, he is permitted to sit in on group meetings and to interview the inmate participants. In short, members

---

[7] This policy reflects a recognition that the conditions in this Nation's prisons are a matter that is both newsworthy and of great public importance. As THE CHIEF JUSTICE has commented, we cannot "continue . . . to brush under the rug the problems of those who are found guilty and subject to criminal sentence. . . . It is a melancholy truth that it has taken the tragic prison outbreaks of the past three years to focus widespread public attention on this problem." Burger, Our Options are Limited, 18 Vill. L. Rev. 165, 167 (1972). Along the same lines, THE CHIEF JUSTICE has correctly observed that "[i]f we want prisoners to change, public attitudes toward prisoners and ex-prisoners must change. . . . A visit to most prisons will make you a zealot for prison reform." W. Burger, For Whom the Bell Tolls, reprinted at 25 Record of N. Y. C. B. A. (Supp.) 14, 20, 21 (1970).

of the press enjoy access to California prisons that is not available to other members of the public.

The sole limitation on newsgathering in California prisons is the prohibition in § 415.071 of interviews with individual inmates specifically designated by representatives of the press. This restriction is of recent vintage, having been imposed in 1971 in response to a violent episode that the Department of Corrections felt was at least partially attributable to the former policy with respect to face-to-face prisoner-press interviews. Prior to the promulgation of § 415.071, every journalist had virtually free access to interview any individual inmate whom he might wish. Only members of the press were accorded this privilege; other members of the general public did not have the benefit of such an unrestricted visitation policy. Thus, the promulgation of § 415.071 did not impose a discrimination against press access, but merely eliminated a special privilege formerly given to representatives of the press *vis-à-vis* members of the public generally.[8]

In practice, it was found that the policy in effect prior to the promulgation of § 415.071 had resulted in press attention being concentrated on a relatively small number of inmates who, as a result, became virtual "public figures" within the prison society and gained a disproportionate degree of notoriety and influence among their

---

[8] It cannot be contended that because California permits family, friends, attorneys, and clergy to visit inmates, it cannot limit visitations by the press. No member of the general public who does not have a personal or professional relationship to the inmate is permitted to enter the prison and name an inmate with whom he would like to engage in face-to-face discourse. Thus, the press is granted the same access in this respect to prison inmates as is accorded any member of the general public. Indeed, as is noted in the text, the aggregate access that the press has to California prisons and their inmates is substantially greater than that of the general public.

fellow inmates. Because of this notoriety and influence, these inmates often became the source of severe disciplinary problems. For example, extensive press attention to an inmate who espoused a practice of non-cooperation with prison regulations encouraged other inmates to follow suit, thus eroding the institutions' ability to deal effectively with the inmates generally. Finally, in the words of the District Court, on August 21, 1971, "[d]uring an escape attempt at San Quentin three staff members and two inmates were killed. This was viewed by the officials as the climax of mounting disciplinary problems caused, in part, by its liberal posture with regard to press interviews, and on August 23 § 415.071 was adopted to mitigate the problem." 364 F. Supp., at 198. It is against this background that we consider the media plaintiffs' claims under the First and Fourteenth Amendments.

The constitutional guarantee of a free press "assures the maintenance of our political system and an open society," *Time, Inc.* v. *Hill,* 385 U. S. 374, 389 (1967), and secures "the paramount public interest in a free flow of information to the people concerning public officials," *Garrison* v. *Louisiana,* 379 U. S. 64, 77 (1964). See also *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964). By the same token, " '[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.' " *New York Times Co.* v. *United States,* 403 U. S. 713, 714 (1971); *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415 (1971); *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 (1963); *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697 (1931). Correlatively, the First and Fourteenth Amendments also protect the right of the public to receive such information and ideas as are published. *Kleindienst* v. *Mandel,* 408 U. S., at 762–763; *Stanley* v. *Georgia,* 394 U. S. 557, 564 (1969).

In *Branzburg* v. *Hayes,* 408 U. S. 665 (1972), the Court went further and acknowledged that "news gathering is not without its First Amendment protections," *id.,* at 707, for "without some protection for seeking out the news, freedom of the press could be eviscerated," *id.,* at 681. In *Branzburg* the Court held that the First and Fourteenth Amendments were not abridged by requiring reporters to disclose the identity of their confidential sources to a grand jury when that information was needed in the course of a good-faith criminal investigation. The Court there could "perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings [was] insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial," *id.,* at 690–691.

In this case, the media plaintiffs contend that § 415.071 constitutes governmental interference with their newsgathering activities that is neither consequential nor uncertain, and that no substantial governmental interest can be shown to justify the denial of press access to specifically designated prison inmates. More particularly, the media plaintiffs assert that, despite the substantial access to California prisons and their inmates accorded representatives of the press—access broader than is accorded members of the public generally—face-to-face interviews with specifically designated inmates is such an effective and superior method of newsgathering that its curtailment amounts to unconstitutional state interference with a free press. We do not agree.

"It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally. . . . Despite the fact that news gathering may

be hampered, the press is regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathering in executive session, and the meetings of private organizations. Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded." *Branzburg* v. *Hayes, supra,* at 684–685. Similarly, newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public.

The First and Fourteenth Amendments bar government from interfering in any way with a free press. The Constitution does not, however, require government to accord the press special access to information not shared by members of the public generally.[9] It is one thing to say that a journalist is free to seek out sources of information not available to members of the general public, that he is entitled to some constitutional protection of the confidentiality of such sources, cf. *Branzburg* v. *Hayes, supra,* and that government cannot restrain the publication of news emanating from such sources. Cf. *New York Times Co.* v. *United States, supra.* It is quite another thing to suggest that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally. That proposition finds no support in the words of the Constitution or in any decision

---

[9] As Mr. Chief Justice Warren put the matter in writing for the Court in *Zemel* v. *Rusk*, 381 U. S. 1, 16–17 (1965), "[t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right. The right to speak and publish does not carry with it the unrestrained right to gather information."

of this Court. Accordingly, since § 415.071 does not deny the press access to sources of information available to members of the general public, we hold that it does not abridge the protections that the First and Fourteenth Amendments guarantee.

For the reasons stated, we reverse the District Court's judgment that § 415.071 infringes the freedom of speech of the prison inmates and affirm its judgment that that regulation does not abridge the constitutional right of a free press. Accordingly, the judgment is vacated, and the cases are remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE POWELL, concurring in part and dissenting in part.

These cross-appeals concern the constitutionality, under the First and Fourteenth Amendments, of a regulation of the California Department of Corrections that prohibits all personal interviews of prison inmates by representatives of the news media. This regulation is substantially identical to the United States Bureau of Prisons policy statement whose validity is at issue in *Saxbe* v. *Washington Post Co., post,* p. 843. For the reasons stated in my dissenting opinion in that case, *post,* p. 850, I would hold that California's absolute ban against prisoner-press interviews impermissibly restrains the ability of the press to perform its constitutionally established function of informing the people on the conduct of their government. Accordingly, I dissent from the judgment of the Court.

The California cross-appeals differ from the *Washington Post* case in one significant respect. Here the constitutionality of the interview ban is challenged by prisoners as well as newsmen. Thus these appeals, unlike *Washington Post,* raise the question whether inmates as

individuals have a personal constitutional right to demand interviews with willing reporters. Because I agree with the majority that they do not, I join Part I of the opinion of the Court.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.*

These cases involve the constitutionality, under the First and Fourteenth Amendments, of prison regulations limiting communication between state and federal prisoners and the press. Nos. 73–754 and 73–918 are cross-appeals from the judgment of a three-judge District Court for the Northern District of California. 364 F. Supp. 196. Suit was brought in that court by four California state prisoners and three professional journalists challenging the constitutionality of California Department of Corrections Manual § 415.071 which imposes an absolute ban on media interviews with individually designated inmates.

The court upheld the prisoners' claim that this regulation is violative of their right of free speech, and, in No. 73–754, the Director of the California Department of Corrections appeals from the court's injunction against further enforcement of the regulation. As to the journalists' claim, the court noted: "The media plaintiffs herein and amicus curiae argue that § 415.071 is violative of not only the prisoners' First Amendment rights, but also the press'. The court disagrees." 364 F. Supp., at 199. In No. 73–918, the journalists appeal this rejection of their claim.

No. 73–1265 involves a media challenge to Federal Bureau of Prisons Policy Statement 1220.1A, ¶ 4 (b) (6), which prohibits press interviews with any particular fed-

---

*[This opinion applies also to No. 73–1265, *Saxbe et al.* v. *Washington Post Co. et al., post,* p. 843.]

eral prisoner in any medium security or maximum security facility. The District Court held the total ban violative of the First Amendment's free press guarantee and enjoined its enforcement. 357 F. Supp. 770. The Court of Appeals affirmed *sub nom. Washington Post Co.* v. *Kleindienst*, 161 U. S. App. D. C. 75, 494 F. 2d 994. As the majority notes, "[t]he policies of the Federal Bureau of Prisons regarding visitations to prison inmates do not differ significantly from the California policies" here under review.

## I

In analyzing the prisoner challenge to California's absolute ban on media interviews with individual inmates, I start with the proposition that "foremost among the Bill of Rights of prisoners in this country, whether under state or federal detention, is the First Amendment. Prisoners are still 'persons' entitled to all constitutional rights unless their liberty has been constitutionally curtailed by procedures that satisfy all the requirements of due process. . . . Free speech and press within the meaning of the First Amendment are, in my judgment, among the pre-eminent privileges and immunities of all citizens." *Procunier* v. *Martinez*, 416 U. S. 396, 428–429 (DOUGLAS, J., concurring in judgment). With that premise, I cannot agree with the Court that California's grossly overbroad restrictions on prisoner speech are constitutionally permissible. I agree that prison discipline, inmate safety, and rehabilitation must be considered in evaluating First Amendment rights in the prison context. First Amendment principles must always be applied "in light of the special characteristics of the . . . environment." *Tinker* v. *Des Moines School District*, 393 U. S. 503, 506; *Healy* v. *James*, 408 U. S. 169, 180. But the prisoners here do not contend that prison officials are powerless to impose reasonable limitations on

visits by the media which are necessary in particularized circumstances to maintain security, discipline, and good order.

All that the prisoners contend, and all that the courts below found, is that these penal interests cannot be used as a justification for an absolute ban on media interviews because "[b]road prophylactic rules in the area of free expression are suspect. . . . Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP* v. *Button,* 371 U. S. 415, 438. And see *Cantwell* v. *Connecticut,* 310 U. S. 296, 311.

It is true that the prisoners are left with other means of expression such as visits by relatives and communication by mail. But the State can hardly defend an overly broad restriction on expression by demonstrating that it has not eliminated expression completely.

As Mr. Justice Black has said:

> "I cannot accept my Brother HARLAN's view [in dissent] that the abridgment of speech and press here does not violate the First Amendment because other methods of communication are left open. This reason for abridgment strikes me as being on a par with holding that governmental suppression of a newspaper in a city would not violate the First Amendment because there continue to be radio and television stations. First Amendment freedoms can no more validly be taken away by degrees than by one fell swoop." *NLRB* v. *Fruit Packers,* 377 U. S. 58, 79–80 (concurring opinion).

A State might decide that criticism of its affairs could be reduced by prohibiting all its employees from discussing governmental operations in interviews with the media, leaving criticism of the State to those with the time, energy, ability, and inclination to communicate

through the mails. The prohibition here is no less offensive to First Amendment principles; it flatly prohibits interview communication with the media on the government's penal operations by the only citizens with the best knowledge and real incentive to discuss them.

I agree with the court below that the State's interest in order and prison discipline cannot justify its total ban on all media interviews with any individually designated inmate on any matter whatsoever. Such a coarse attempt at regulation is patently unconstitutional in an area where "[p]recision of regulation must be the touchstone." *NAACP* v. *Button, supra,* at 438; *Elfbrandt* v. *Russell,* 384 U. S. 11, 18. I would affirm the District Court's judgment in this regard.

## II

In Nos. 73–918 and 73–1265, the media claim that the state and federal prison regulations here, by flatly prohibiting interviews with inmates selected by the press, impinge upon the First Amendment's free press guarantee, directly protected against federal infringement and protected against state infringement by the Fourteenth Amendment. In rejecting the claim, the Court notes that the ban on access to prisoners applies as well to the general public, and it holds that "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Ante,* at 834.

In dealing with the free press guarantee, it is important to note that the interest it protects is not possessed by the media themselves. In enjoining enforcement of the federal regulation in No. 73–1265, Judge Gesell did not vindicate any right of the Washington Post, but rather the right of the people, the true sovereign under our constitutional scheme, to govern in

an informed manner. "The press has a preferred position in our constitutional scheme, not to enable it to make money, not to set newsmen apart as a favored class, but to bring fulfillment to the public's right to know. The right to know is crucial to the governing powers of the people." *Branzburg* v. *Hayes,* 408 U. S. 665, 721 (DOUGLAS, J., dissenting).

Prisons, like all other public institutions, are ultimately the responsibility of the populace. Crime, like the economy, health, education, defense, and the like, is a matter of grave concern in our society and people have the right and the necessity to know not only of the incidence of crime but of the effectiveness of the system designed to control it. "On any given day, approximately 1,500,000 people are under the authority of [federal, state and local prison] systems. The cost to taxpayers is over one billion dollars annually. Of those individuals sentenced to prison, 98% will return to society."[1] The public's interest in being informed about prisons is thus paramount.

As with the prisoners' free speech claim, no one asserts that the free press right is such that the authorities are powerless to impose reasonable regulations as to the time, place, and manner of interviews to effectuate prison discipline and order. The only issue here is whether the complete ban on interviews with inmates selected by the press goes beyond what is necessary for the protection of these interests and infringes upon our cherished right of a free press. As the Court of Appeals noted in No. 73–1265: "[W]hile we do not question that the concerns

[1] Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 93d Cong., 2d Sess., Report on the Inspection of Federal Facilities at Leavenworth Penitentiary and the Medical Center for Federal Prisoners 2 (Comm. Print 1974).

voiced by the Bureau [of Prisons] are legitimate interests that merit protection, we must agree with the District Court that they do not, individually or in total, justify the sweeping absolute ban that the Bureau has chosen to impose." 161 U. S. App. D. C., at 86, 494 F. 2d, at 1005.

It is thus not enough to note that the press—the institution which "[t]he Constitution specifically selected . . . to play an important role in the discussion of public affairs" [2]—is denied no more access to the prisons than is denied the public generally. The prohibition of visits by the public has no practical effect upon their right to know beyond that achieved by the exclusion of the press. The average citizen is most unlikely to inform himself about the operation of the prison system by requesting an interview with a particular inmate with whom he has no prior relationship. He is likely instead, in a society which values a free press, to rely upon the media for information.

It is indeed ironic for the Court to justify the exclusion of the press by noting that the government has gone beyond the press and expanded the exclusion to include the public. Could the government deny the press access to all public institutions and prohibit interviews with all governmental employees? Could it find constitutional footing by expanding the ban to deny such access to everyone?

I agree with the courts below in No. 73–1265 that the absolute ban on press interviews with specifically designated federal inmates is far broader than is necessary to protect any legitimate governmental interests and is an unconstitutional infringement on the public's right to know protected by the free press guarantee of the First Amendment. I would affirm the judgment in this re-

---

[2] *Mills* v. *Alabama*, 384 U. S. 214, 219.

gard. Since this basic right is guaranteed against state infringement by the application of the First Amendment to the States through the Fourteenth,[3] California's absolute ban can fare no better. I would reverse the District Court's rejection of this claim in No. 73–918.

---

[3] "While Mr. Chief Justice Hughes in *Stromberg* v. *California*, 283 U. S. 359, stated that the First Amendment was applicable to the States by reason of the Due Process Clause of the Fourteenth, it has become customary to rest on the broader foundation of the entire Fourteenth Amendment. Free speech and press within the meaning of the First Amendment is, in my judgment, one of the pre-eminent privileges and immunities of all citizens." *Procunier* v. *Martinez*, 416 U. S. 396, 428–429 (DOUGLAS, J., concurring in judgment).