**MAIN ROAD et al., Plaintiffs,**

v.

**Louis S. AYTCH, Superintendent, Philadelphia Prison System.**

**Civ. A. No. 73–902.**

United States District Court,
E. D. Pennsylvania.

Oct. 29, 1974.

Elliot B. Platt, Community Legal Services, Inc. Philadelphia, Pa., for plaintiffs.

Stephen T. Saltz, Asst. City Sol., Law Dept. City of Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

This is an action seeking declaratory and injunctive relief prohibiting the Superintendent of the Philadelphia Prison System from denying prisoners in these institutions access to the media, either in the form of press conferences or direct individual interviews with a reporter on a one-to-one basis. Plaintiffs allege that the actions of the defendant Aytch, Superintendent of the Philadelphia Prison System, have resulted in their being denied their rights under the First, Fifth, and Fourteenth Amend-

ments of the United States Constitution. These complaints are properly brought under 42 U.S.C. § 1983, and jurisdiction exists in this Court under 28 U.S.C. § 1343(3).

Plaintiffs moved for a preliminary injunction on July 30, 1973. With the consent of the parties, a consolidated hearing on both the preliminary and permanent injunctions was held on September 25 and 26, 1973. At the hearing, plaintiffs' motion for declaration of class action was granted. After evidence was presented by both sides, the motion for a preliminary injunction was denied. Thereafter, the parties were requested to file findings of fact and conclusions of law. Final disposition of the litigation was thereafter deferred pending decision by the Supreme Court of docketed cases (hereinafter discussed) involving similar issues.

The facts may be summarized as follows:

## A. STRUCTURE OF PHILADELPHIA PRISON SYSTEM

The plaintiff class consists of all prisoners incarcerated in the Philadelphia Prison System. The population of the prison system numbers approximately 2400 inmates, of whom approximately 85% are pretrial detainees charged with all types of offenses. The remaining 15% of the prison population consists of convicted prisoners serving sentences of less than two years. The Philadelphia Prison System consists of three prisons: (1) Holmesburg Prison; (2) The Detention Center; and (3) The House of Corrections. The population of Holmesburg Prison, numbering approximately 1,000 inmates, includes both sentenced prisoners and pretrial detainees.[1] All of the inmates of the Detention Center, which has a capacity of approximately 750 male adults, are pretrial detainees. The population of the House of Corrections, the system's only minimum security facility, includes both pretrial and sentenced male adults, juvenile offenders awaiting trial, and female prisoners. The defendant Aytch, as Superintendent of the Philadelphia Prison System, is responsible for the administration of these correctional facilities.

## B. NEGOTIATIONS DEALING WITH THE FEASIBILITY OF PRISONERS HOLDING PRESS CONFERENCES

In October of 1972, one of the plaintiff organizations, Inmates Action Council (hereinafter referred to as "IAC"), was concerned with the fact that inmates were not receiving notice of continuance dates when trials or hearings were postponed. IAC, with the approval of defendant Aytch and in conjunction with staff personnel from the Community Legal Services organization (hereinafter referred to as "CLS"), documented the severity of the problem by surveying the inmate population. After completing the survey, two members of the CLS staff, authorized to act as legal counsel for IAC, asked the defendant for permission to hold a press conference so that they might inform the public of the problem. Superintendent Aytch denied this request after learning that the Philadelphia Voluntary Defender office, the organization representing many of the inmates in their pending criminal trials, refused to send a representative to the conference. The defendant argues that he was attempting to protect the inmates from prejudicing their pending criminal cases.[2] However, it also appears that the defendant was concerned about the possibility that inmates' public criticism of the Defender Association might result in a clash between his office and the Voluntary Defender.

The plaintiff organizations attempted to schedule a second news conference in

---

1. Only those pretrial detainees subject to a bail requirement of over $4,000 are sent to Holmesburg.

2. Superintendent Aytch, realizing the seriousness of the problem, did offer to meet with prisoners to discuss possible ways of solving the problem.

March of 1973, this time dealing with alleged irregularities in probation procedures. After conducting a prisonwide survey to document their allegations, they requested permission to hold a news conference to publicize the problem. On March 2 and 15, 1973, Superintendent Aytch met with representatives of the respective inmate groups to discuss the possibility of holding the press conference. At the March 2, 1974 meeting, defendant Aytch informed the inmates that he had no authority to grant permission for the press conference, but that he would discuss the press conference issue with his supervisors. In his second meeting with the inmates on March 15, defendant Aytch was accompanied by the Supervisor of the Philadelphia Probation Office and the Regional Director for Parole Supervision for the State of Pennsylvania. At the end of the meeting the Superintendent informed the inmates that he had authority to grant permission, but that he would exercise this power only if the Probation Office concurred in his decision. Apparently the representative of the Probation Office refused permission and the inmate request was denied.[3]

Ignoring the Superintendent's refusal, members of the plaintiff class and their CLS representatives, without informing the defendant, proceeded to schedule a press conference on April 4, 1973. When the press arrived, they were refused access to the prison. Although the media representatives were not anticipated visitors, Superintendent Aytch met with them at the Detention Center, explained that the inmates and their CLS representatives were not authorized to call the press conference, and attempted to arrange interviews between the reporters and individual inmates. Charles Stone, a reporter from the Philadelphia Daily News, was permitted to interview two inmates at the House of Detention about their problems with parole practices. George Straight, another reporter present on that date, stated in his affidavit that he was refused permission to interview inmate Charles Cobbs because defendant Aytch "could not make proper arrangements then." Although the record does not explicitly clarify the reasons for the disparate treatment, it does appear that Cobb was an inmate at Holmesburg Prison and that greater advance notice may have been required at that institution.

Apparently, the results of the continuance and probation surveys were never communicated to the proper government agencies. The only information released was a seven-page press release disseminated to the media on April 4, 1973. The first four pages of the document contained a summary of the probation problem and the remaining three pages gave specific examples of the procedure, as applied to 21 inmates. The representatives of CLS informed the Court that their clients had instructed them that their complaints should be transmitted through the media, or not at all. No evidence in the record suggests that any of the survey information was presented to the Voluntary Defender, probation officials or defendant Aytch.

It is clear from the evidence that Superintendent Aytch, in the past, has permitted large gatherings of inmates and "outsiders" within the prison walls. In May of 1973, the Superintendent approved a request for a press conference sponsored by "Gang Relate With Society," an inmate group at Holmesburg Prison. The press conference was attended by several inmates, prison personnel, representatives of the city government, several reporters and a television camera crew. In addition, there have

---

3. Throughout the hearing the defendant testified that the prisoners not only asked permission to hold a press conference, but also requested the Superintendent to sponsor the press conference as an official prison function. In contrast, the plaintiffs attempted to prove that they sought only permission to hold the conference, not official acknowledgement that the Superintendent supported their position. Resolution of this factual question is of no particular significance.

been a number of large social gatherings held within the prison system during the last few years. Events such as drama productions, banquets, and sports events have brought numerous visitors, including reporters, into the penal institutions.

## C. DIRECT ACCESS TO THE MEDIA ON AN INDIVIDUAL BASIS

The parties agree that the defendant has not sought to suppress all prisoner-press contact. Any inmate of the Philadelphia Prison System can write to any member of the news media and the communications will not be censored. In addition, the overwhelming weight of the evidence supports defendant's claim that, with rare exceptions, he never denies an inmate's request to meet with a member of the news media or denies a member of the news media the opportunity to meet with an inmate. Defendant has submitted a voluminous list of prisoner-press contacts for the period 1970 through 1973. In contract, the record discloses only two occasions when specific interview requests were denied.[4] The first occasion was a request to enter Holmesburg Prison soon after a major disturbance at that facility. The second instance, involving George Straight's unsuccessful attempt on April 4, 1973, is described above.

## D. PROCEDURE FOR PROCESSING REQUESTS FOR MEDIA CONTACT

The Philadelphia Prison System has no written regulations or standard policy regarding inmate press conferences or individual interviews with reporters. All press contacts with inmates must first be approved by Superintendent Aytch. Defendant Aytch has the discretionary power to grant all interview requests. However, he has a tacit understanding with the Board of Trustees of the Prison System, the Com-missioner of Public Welfare, and the City Solicitor, that he will consult with them before taking any major action. If a request for an interview is denied, there is no procedure for obtaining an administrative hearing to review the decision.

In processing any request, the Superintendent attempts to gauge both the "climate" or tension level of the institution involved and the purpose or subject matter of the interview. If the tension level in the prison is high, or if the subject matter of the interview touches on a sensitive issue, the Superintendent might decide that there is a "security risk" in allowing the interview. In attempting to clarify what factual setting might constitute a "security risk," Defendant Aytch stated that he might have to postpone or refuse an interview request if the substance of the interview were to deal with a charge that a group of white guards had beaten up a black inmate. Aytch also stated that interviews dealing with "religious or racial" issues might be "explosive" and might have to be censored. In addition, he stated that he would feel responsible for the safety of any reporter within the prison walls and pointed to a recent incident where a social worker was attacked by an inmate.

The Superintendent's preoccupation with security is well-founded. Between January 1, 1973 and September 25, 1973, there were numerous disturbances within the correctional institutions, including (1) 113 cases of assault, near riots, and other incidents requiring police intervention; (2) a homicide of a Holmesburg Prison resident on August 19, 1973; (3) the murder of both the warden and deputy warden of Holmesburg Prison on May 31, 1973; and (4) approximately 40 "extraordinary occurrences," including suicides, murders, escapes, etc., which are not included in the "incidents" reported in (1) above.

---

4. Although the record is not clear, it appears the defendant Aytch may have made a general statement at the May 2, 1973 meeting to the effect that individual interviews with the media on the probation issue would be temporarily denied pending consultation with his superiors on the press conference issue.

Although both sides agree that the above incidents were not precipitated by the presence or actions of representatives of the media, the defendant contends that the inherently volatile nature of prison existence is a constant threat to the physical welfare of any reporter in one of the prison institutions. In addition, defendant Aytch is equally concerned that interviews dealing with "sensitive issues," subsequently communicated to the prisoners by newspapers, television or radios, might result in internal disturbances. He insists that although the prison climate may be calm at any given time, it is impossible to predict what information may inflame the prisoners' underlying hostilities. Therefore, he argues that the wisest course of action would be to investigate potentially inflammatory subjects before granting an interview, in the hope that he can defuse a potential problem area without risking the dissemination of the information through the press.

## DISCUSSION

As noted above, decision of this case was deferred in anticipation of the decision of the United States Supreme Court in the related cases of Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) and Saxbe v. The Washington Post Company, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974). In *Pell*, the Court upheld the constitutionality of a statewide prison regulation which provided that "press and other media interviews [with prisoners] will not be permitted," against challenges by prison inmates that the regulation violated their First Amendment rights. In Saxbe v. The Washington Post Company, the Court upheld the constitutional validity of a rule of the Federal Bureau of Prisons which provided that "press representatives will not be permitted to interview individual inmates," as against a challenge by the newspapers that the regulation impermissibly denied them access to news, in violation of the First Amendment.

Read together, the two decisions clearly establish the following principles: (1) representatives of the press have no greater right of access to prison inmates than do members of the general public, and (2) regulations barring prisoners from being interviewed by the press are constitutionally valid, so long as (a) there is no differentiation based upon the contents of the communication, and (b) the prisoners are not denied reasonable access to the press by alternative means (e. g., mail, and communications by way of their relatives and attorneys).

It is clear in the present case that press interviews with individual inmates are permitted. The principal issue, plaintiffs' claimed right to convene group press conferences, can no longer be seriously asserted, in view of *Pell* and *Saxbe*. Indeed, those decisions would be wholly dispositive of this litigation, were it not for the presence, in this case, of two factors which were not involved in either of the cited cases. Here, a substantial proportion of the inmates seeking relief are pretrial detainees, rather than sentenced prisoners; and we are dealing, not with written regulations, but with "rule of thumb" applications of unwritten policies which, at least arguably, may vary in accordance with the topic to be discussed by the prisoners. Thus, it is necessary for this Court to decide whether, in the light of *Pell* and *Saxbe*, the existing policies in the Philadelphia Prison System regarding press interviews may constitutionally be applied to pretrial detainees, and whether there is need for judicial intervention to insure that there will be no discriminatory treatment based upon the content of the prospective interview.

The rationale in the *Pell* case is that the free speech rights of prison inmates may lawfully be restricted in order to serve the Government's legitimate interest in confining prisoners to deter crime, to protect society by quarantining criminal offenders for a period during which rehabilitative measures can be applied, and to maintain the internal security of penal institutions (pp. 821–824 of 416 U.S., 94 S.Ct. 2803–2805). In contrast to sentenced pris-

oners, pretrial detainees are presumed to be innocent. For the most part, they are in custody only because they lack the resources to provide some other acceptable assurance that they will appear for trial when summoned. Thus, with respect to the vast majority of pretrial detainees, the deterrence, rehabilitation, and quarantine justifications referred to in *Pell* do not apply. It is reasonable to assume that some of the pretrial detainees in the Philadelphia Prison System (all of them, theoretically, located in Holmesburg Prison) are in custody because they were denied bail altogether, or subject to high bail, on a finding that they represent potential dangers to the community. As to these inmates, the quarantine rationale would be applicable.

█ Thus, it can be argued that of all societal interests which were found in *Pell* to outweigh the First Amendment rights of prisoners, the only one which can properly be considered in balancing the interests of most pretrial detainees is society's interest in maintaining prison security. But this somewhat overstates the matter. The Court in *Pell* was not addressing itself specifically to the situation of pretrial detainees, and therefore had no occasion to discuss all of the factors which might be pertinent to the balancing process in such cases. Society does presumably have an interest in seeing to it that persons charged with crime appear for trial when summoned. If, pursuant to preliminary legal proceedings, it is determined that imprisonment to insure attendance is called for, then it would seem to follow that society has a legitimate interest in maintaining the detainee in custody. In short, for purposes of assessing the validity of prison regulations, courts must assume that the inmates are lawfully incarcerated.

█ It appears to be generally recognized that unsentenced prisoners cannot be required to perform uncompen-

sated labor. *Cf.* United States ex rel. Fidtler v. Hendricks, 497 F.2d 794 (3d Cir. 1974). But there can be no doubt that an unsentenced prisoner, like any other prisoner, may properly be deprived of many of the ordinary rights and privileges of free men.

It is unnecessary in the present case to attempt to define the limits of the restrictions which may properly be imposed upon unsentenced prisoners, or the extent (if any) to which additional restrictions upon unsentenced prisoners may be justified by reason of their incarceration in the same institution with sentenced prisoners. In the Philadelphia Prison System, individual press interviews are permitted, irrespective of whether the inmate is a pretrial detainee or a sentenced convict. And, while the *Pell* and *Saxbe* decisions were not concerned with pretrial detainees, I am entirely satisfied that the Supreme Court would not strike down a restriction against group press conferences by inmates even though unsentenced. The "prison security" rationale may be less compelling in the case of unsentenced detainees, but it surely retains enough force to justify the very slight restriction upon First Amendment rights represented by proscription of group press conferences.

The more difficult question in the present case arises from the suggestion of censorship which may be gleaned from the evidence. However, I have concluded that judicial intervention is not required at this time, for the following reasons. In the first place, while Superintendent Aytch did state that he would permit press conferences on some issues, and not on others, it is not clear that any such distinctions would necessarily be attempted in the case of individual interviews. In the second place, the defendant may merely have chosen unfortunate language in attempting to express his concern with problems of prison security.[5] Finally, and most

---

5. Defendant's expressed reluctance, under some circumstances, to authorize press conferences for the purpose of airing racial disturbances can perhaps be so construed. The defendant did not bar press interviews on the probation and Voluntary Defender issues.

importantly, the intervening decisions in the *Pell* and *Saxbe* cases now make it clear that such censorship is not permissible. There is no reason to doubt that the defendant, whose policies on the subject of prisoner-press dealings are obviously much more enlightened than the minimum standards sanctioned by the Supreme Court, will fail to abide by the Court's guidelines on the question of censorship.

My conclusions may therefore be summarized as follows: Plaintiffs have failed to establish that prison inmates, whether sentenced or unsentenced, have a constitutional right to hold group press conferences. Plaintiffs have likewise failed to establish the existence of any policy or practice of prohibiting individual interviews between prison inmates and representatives of the news media. And plaintiffs have failed to establish a need for injunctive relief to prevent impermissible censorship of press interviews, since it is unlikely that such consorship will occur hereafter. Therefore, this action must be dismissed.