**R.W. BEASLEY, et al., Plaintiffs,**

**v.**

**Jim WHARTON, etc., Defendant.**

**C.A. No. 87–142–1–MAC (WDO).**

United States District Court,
M.D. Georgia,
Macon Division.

April 15, 1988.

---

Ralph Goldberg, Atlanta, Ga., for plaintiffs.

Jennifer L. Hackemeyer, Atlanta, Ga., for defendant.

## ORDER

OWENS, Chief Judge.

Pursuant to the court's order of December 15, 1987, this court held on December 21, 1987, a hearing to determine both the merits of plaintiffs' case and the appropriateness of injunctive relief. *See* Order of this court dated December 15, 1987. At that hearing, plaintiffs Bobby Anglin and Eloise Dixon presented evidence to support their claim that the visitation policy at the Middle Georgia Correctional Institution, Men's Unit, of not allowing prisoners to visit with persons whom they were not acquainted with prior to their incarceration violates various provisions of the Constitution of the United States. The State of Georgia responded to these allegations by putting up evidence to justify the prison regulations in question. Now that both sides have had an opportunity to submit all evidence they consider relevant to this dispute, the court is prepared to render a decision.

### Factual Findings

Mr. Bobby Anglin is presently incarcerated at the Middle Georgia Correctional Institution, Men's Unit, in Hardwick, Georgia, and is serving time for the crime of child molestation. Ms. Eloise Dixon is a fifty-four (54) year old woman that has become acquainted with Mr. Anglin subsequent to his incarceration, and who now seeks to have visitation rights established with Mr. Anglin. She currently has regular contact with Mr. Anglin through the mail and also by way of regular telephone conversations.

Ms. Dixon first became acquainted with Mr. Anglin through her friend Ruby Pruett. Ms. Pruett had been in contact with Ryland Beasley, who was also a prisoner in the Middle Georgia Correctional Institution. Ms. Pruett suggested to Ms. Dixon that she should also try writing to one of the prisoners in the prison system.

Ms. Pruett thereafter wrote to Mr. Beasley stating that she had a friend that was single who would like to correspond with one of the prisoners. Eventually, Ms. Dixon began corresponding directly with Mr. Anglin. By reason of this contact, Mr. Anglin now states that given the chance, he would like to marry Ms. Dixon. He has also listed Ms. Dixon as his fiancee on his visitor's list.

The warden of the Middle Georgia Correctional Institution, Men's Unit, Jim Wharton, testified about the circumstances surrounding the denial of Ms. Dixon's request to visit Mr. Anglin. He stated that his policy is to deny visitation with any persons who were not acquainted with the prisoner prior to his incarceration. Mr. Wharton further testified that his reason for maintaining such a policy is to insure that the persons visiting the prisoners have legitimate personal reasons for coming to the prison, as opposed to satisfying mere curiosity interests. In addition, he stated that due to a unique situation at Middle Georgia Correctional Institution, he has a large percentage of his inmates working in the local community. He stated that in order to prevent problems with his prisoners associating themselves with the public, he instituted the rule that prisoners cannot visit with anyone they were not acquainted with prior to their incarceration. Furthermore, he found that to make an exception in one case could lead to serious problems in imposing this policy on the remainder of the inmate population. He also found that for security reasons this policy aids in allowing the prison officials to keep better track of the persons actually coming into the prison system, and whether they have genuine personal reasons for their visit, or, in fact, have ulterior motives for coming to the prison.

While Mr. Wharton was also originally concerned with the possibility that Mr. Anglin was attempting to con Ms. Dixon into giving him financial support, Mr. Wharton testified that he now has no basis to believe that this type of conduct was taking place between Ms. Dixon and Mr. Anglin, other than the fact that Mr. Beas-

ley had been suspected of engaging in such conduct, and that it was Mr. Beasley who introduced Mr. Anglin to Ms. Dixon. Mr. Wharton stated that he believes Ms. Dixon and Mr. Anglin are telling the truth when they say they have genuine emotions for each other, but that he cannot grant an exception in their case because of the possible ramifications such an exception would have on the general prison population. In addition, he adds that by maintaining this prison policy, it helps to prevent future conduct such as that suspected by Mr. Beasley, and in the end, protects both the public from prisoner misconduct, while creating at the same time a better environment for rehabilitation.

### Conclusions of Law

■ The court begins its analysis by recognizing the fact that convicted prisoners have no absolute constitutional right to visitation. *See Lynott v. Henderson,* 610 F.2d 340, 342 (5th Cir.1980). In fact, the Supreme Court has held in *Block v. Rutherford,* 468 U.S. 576, 589, 104 S.Ct. 3227, 3234, 82 L.Ed.2d 438 (1984), that an absolute prohibition of contact visitation with pretrial detainees, who obviously have more rights than a convicted prisoner, does not violate the Constitution so long as a responsible, experienced administrator has determined, in his sound discretion, that such visits will jeopardize the security of the facility. The Supreme Court in *Block* also reaffirmed its holdings in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), that prison administrators must be accorded wide-ranging deference in adopting and executing policies designed to preserve order, security and discipline in the prisons. In the absence of any showing that defendants have exaggerated their response to such considerations, their expert judgment regarding contact visitation must be accepted. *See Pell,* 417 U.S. at 827, 94 S.Ct.

at 2806; and *Whittington v. Norris,* 602 F.Supp. 954, 955 (E.D.Ark.1984). In *Pell,* the Supreme Court was reviewing a prison policy that prohibited face-to-face press and media interviews with specific inmates. In addressing the visitation policy limiting face-to-face visits to family members, to friends of prior acquaintances, to legal counsel, and to clergy, the Supreme Court acknowledged:

> In the judgment of the state correctional officials, this visitation policy will permit inmates to have personal contact with those persons who will aid in their rehabilitation, while keeping visitations at a manageable level that will not compromise institutional security. Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

*Pell,* 417 U.S. at 827,[1] 94 S.Ct. at 2806.

■ While it seems clear that in this case, Ms. Dixon does have genuine feelings for Mr. Anglin, and that perhaps allowing her to visit would not create any problems in the prison system, this court cannot say that the prison regulation in question is an exaggerated response to the concerns of prison management. In fact, this court has heard evidence in Mr. Beasley's case of just how prisoners, if left unchecked, can attempt to abuse the system. These concerns have caused the warden to initiate a policy, that although possibly overbroad in some cases, allows him to maintain security in the prison and to enhance the rehabilitative atmosphere in the prison. Furthermore, the court has heard evidence that it would be unduly burdensome to attempt to set up a procedure whereby individual exceptions to this regulation could be granted regularly.

---

**1.** *See also Thorne v. Jones,* 765 F.2d 1270 (5th Cir.) (Taken together, *Hudson, Black,* and *Wolfish* indicate unmistakably that security-related decisions of prison officials are to be reviewed only for reasonableness; if the decisions are rational (an exceedingly undermanding standard), courts are to look no further.), *cert. denied,* 45 U.S. 1016, 106 S.Ct. 1198, 1199, 89 L.Ed.2d 313 (1985).

This court also listened to plaintiffs' expert, Mr. Eugene M. Nuth, who is an assistant warden at the Maryland Correctional Institute in Jessup, Maryland. This court was impressed with Mr. Nuth's credentials and opinions on this matter, however, it appears to the court that the management decisions he would make in his prison system are simply not sufficient to demonstrate that Mr. Wharton's decisions in this instance are not reasonable ones. The wide latitude that this court must give to prison administrators' decisions requires plaintiffs to present much more evidence of unreasonableness before this court can overturn their decisions.

Finally, the court notes that Mr. Anglin can still freely communicate with Ms. Dixon by both the mails and the telephone. He can also meet with his family and any other person that he was acquainted with prior to his incarceration. Under these circumstances, the court simply cannot find that the prison regulation in question is an exaggerated response to the problems inherent in prison management, and, therefore, FINDS this regulation to be constitutional. Accordingly, plaintiffs are not entitled to injunctive relief and their claims are hereby DISMISSED entirely with prejudice.[2]

---

[2]. Of course, this order does not preclude the warden at some later date to decide that in this case an exception might be granted. This court, however, cannot dictate such management decisions absent more substantial evidence than was presented in this case.