Gerald J. AZEFF

v.

COMMONWEALTH OF PENNSYLVA-
NIA et al.

Civ. A. No. 79–2212.

United States District Court,
E. D. Pennsylvania.

June 25, 1980.

Richard Kirschner, Philadelphia, Pa., for plaintiff.

Maria Parisi Vickers, Asst. Atty. Gen., Philadelphia, Pa., for defendants.

## MEMORANDUM

POLLAK, District Judge.

On March 22, 1979, Gerald Azeff, an Institutional Parole Representative at the State Correctional Institution at Graterford, was suspended from his job for one day. The cause for the suspension, as explained to Azeff at the time of the imposition of discipline, was his "poor judgment in inflaming or aggravating an already serious situation" in that he had distributed copies of a letter critical of the prison administration's staffing policies to his co-workers. Three months after his suspension, Azeff filed this action pursuant to 42 U.S.C.

§ 1983, asserting that the suspension violated his rights under the First and Fourteenth Amendments, and seeking injunctive relief, compensatory and punitive damages. An evidentiary hearing produced the following history of the events which culminated in Azeff's suspension.[1]

## I.

### A.

The Pennsylvania Board of Probation and Parole maintains an office at the State Correctional Institution at Graterford. At the time of the incidents in question here, the office was headed by Thomas J. Feeney, an Institutional Parole Supervisor. Mr. Feeney's staff consisted of Azeff and two other Institutional Parole Representatives. On matters of importance, Feeney reported to Herman Tartler, the Director of the Bureau of Pre-Parole Services of the Board of Probation and Parole. Tartler, located in Harrisburg, supervised a total of approximately ninety persons statewide. Although the Board of Probation and Parole occupies office space at Graterford, it is administratively independent of the Pennsylvania Bureau of Corrections, the agency which governs state prisons. Thus, Feeney and his staff operated at Graterford along lines of authority distinct from the control which Superintendent Julius T. Cuyler exercised over the staff of some five hundred corrections officers, psychologists, counselors, teachers, and others, who also worked at the institution. But, despite this formal separation, the supervisory staff of the Board of Probation and Parole perceived the maintenance of good relations between themselves and the prison's supervisory staff as critical to the Board's effective functioning: conformity to prison regulations was felt to be an essential component of the much desired good working relationship.

### B.

On Tuesday, March 20, 1979, Captain Felix Mokychic, a correctional officer, was fatally injured by an inmate wielding a baseball bat. A state of emergency was declared: Inmates were locked in their cells. The entire institution was systematically searched. Guards were put on twelve-hour shifts. Vacations were cancelled. Housekeeping chores usually performed by the inmates—janitorial work, food preparation and distribution, maintenance work—were being performed by prison employees including both correctional officers and members of the treatment staff.[2]

On March 21, Azeff, upset over Officer Mokychic's death, drafted a letter to Governor Thornburgh. When Azeff arrived at work on March 22, he asked a clerical member of the parole staff, as a personal favor, to type his draft on the stationery of the American Federation of State, County and Municipal Employees (A.F.S.C.M.E.) of which Azeff was a local officer. The letter[3] was very critical of the prison administration's ordering of priorities—condemning the "tragic negligence" of the administration in providing "a full complement of high-salaried social workers, counselors and administrators," while failing to "properly man the walls or cell blocks with guards."

1. Concurrent with this court action, plaintiff, through his Union, Council 13, A.F.S.C.M.E., prosecuted a grievance under an agreement between the Union and the Commonwealth. With an arbitration hearing—the final step in the Commonwealth's multi-stage grievance-arbitration process—scheduled for March 6, 1980, I entered an order, on January 17, 1980, deferring my decision pending the outcome of the arbitration. On April 2, 1980, Arbitrator Gladys Gershenfeld denied the Union's grievance, holding that there had been just cause for the suspension and that it was therefore proper under the agreement. She did not address the constitutional claims.

2. The state of emergency lasted approximately five days. The search was completed on March 24, and Superintendent Cuyler gave the order to "unlock" the institution on March 25. Shortly after the unlocking process began, the correctional officers walked off the job in protest. They began returning to work on the afternoon of March 26, and the prison began, at that time, to return to its normal routine.

3. The letter is reproduced in its entirety as appendix A.

Azeff received the typescript of the letter shortly before noon on March 22. He photostated about ten copies, mailing the original to the Governor, and sending copies to the Lieutenant Governor and the (Commonwealth) Attorney General. He furnished copies of the letter to a number of his colleagues in the parole office and on the staff of the prison. To a number of individuals, Azeff suggested that the letter should be posted on the union bulletin board. And indeed the letter was so posted on March 22, though, on this record, it is not clear just who did the posting.

Later that day, Larry Reid, the Director of Treatment (supervisor of treatment personnel) at Graterford removed a copy of the letter from the union bulletin board and brought it to Superintendent Cuyler. In light of the situation at the prison, both Cuyler and Reid were very disturbed by the letter. Cuyler called Feeney to his office to express his displeasure. Cuyler viewed the situation at the prison as tense; he saw the letter as inflammatory and divisive. In his view, anything which would create additional hazards during the emergency would have to be removed from the scene. Cuyler told Feeney that he intended to advise Chairman Jacobs of the Board of Probation and Parole of what had taken place, and of his desire that such incidents not recur. He also noted his hope that the working relationship established between the corrections department and the parole staff would continue on good terms.

Feeney called Tartler to report that he had been called to the Superintendent's Office. He further reported that the Superintendent and the staff were very upset by Azeff's letter. Tartler called Chairman Jacobs and discussed the matter with him. Assistant Attorney General Robert Greevy, and Messrs. McCool and Yerger—the Board's labor relations expert, and the Director of the Bureau of Administrative Services, respectively—were also consulted. It was decided that the text of the letter should be at hand before any decision on the matter was made, and Feeney dictated the letter to the Chairman's secretary over the telephone. Tartler again discussed the letter with his colleagues and decided to suspend Azeff for one day, effective at that day's close of business.[4] Tartler phoned Feeney and told him precisely what to say to Azeff. At approximately 4:30 P.M., Feeney called Azeff to his office and informed him that he was being suspended, not for writing the letter to the Governor, but for distributing the letter at the institution and "for using poor judgment in inflaming or aggravating further an already serious situation." [5]

4. Tartler's disciplinary authority encompasses the power to suspend an employee for up to one day.

5. In arguments invoking the spectres of vagueness, overbreadth, and prior restraint, plaintiff has attempted to link his suspension to the unwritten, but widely acknowledged policy of the prison, pursuant to which the distribution of all controversial materials at the prison without the prior approval of the Superintendent is prohibited. Indeed, Superintendent Cuyler, in his hearing testimony, associated his objection to Azeff's distribution of the letter, with the general policy under which all material brought into the prison by an "outsider"—a category encompassing parole board personnel because they are not prison employees—was considered contraband unless it had received his approval. But while Superintendent Cuyler possessed the power summarily to direct Azeff's physical removal from the prison for violating prison rules, or for posing a threat to prison security, Cuyler did not exercise that power in this case. And the Superintendent had no direct authority over the conditions of Azeff's employment.

Azeff's superiors in the Board of Probation and Parole were aware of the Superintendent's prior approval policy. And they recognized an obligation on the part of their employees to obey all prison regulations. But while Azeff's conduct may have been inconsistent with the Superintendent's restriction on contraband, that ban played, at most, only an indirect role in their disciplinary decision. At the time they imposed the suspension, Azeff's superiors were concerned principally with the effect of the letter in the context of the prison emergency, and secondarily with the maintenance of good relations with Superintendent Cuyler and other officials of the Bureau of Corrections. These factors—not the failure to submit the letter for the Superintendent's approval—constituted the "just cause" for suspension.

Considering the substantial interests of the state in maintaining order and discipline in its prisons, it is less than clear that a prior approval policy, if narrowly drawn to effect those

## II.

*Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), is the starting point in analyzing the rights of public employees who have been subjected to disciplinary action for expressing their opinions. In *Pickering*, the Court considered a teacher's claim that he had been dismissed, in violation of the First Amendment, for having sent a letter critical of the school board's handling of certain revenue bond proposals. The Court rejected the argument that as a condition of employment "teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work . . ." 391 U.S. at 568, 88 S.Ct. at 1734. But at the same time, the Court recognized that the requirements of the state *qua* employer may warrant restrictions on the speech of state employees that would be constitutionally impermissible in other contexts:

> [I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those which it possesses in connection with regulation of the speech of the citzenry in general. The problem

in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

391 U.S. at 568, 88 S.Ct. at 1734. The *Pickering* Court did not undertake to set a standard by which all statements by public employees, critical of their superiors, might be judged. The circumstances of each case would control. But the Court did indicate "the general lines along which an analysis should run," 391 U.S. at 569, 88 S.Ct. at 1735:

> ▆ The letter which had prompted the teacher's dismissal was not directed against any person with whom the teacher would ordinarily come in contact in the normal course of his employment. "[T]hus, no question of maintaining either discipline by immediate superiors or harmony among co-workers" was presented. Neither was the dismissed teacher's working relationship with the board—the target of the teacher's criticism—so close as to demand a duty of strict personal loyalty. In short, there was nothing peculiar to the employment relationship which might have provided constitutionally sufficient justification for the

interests, would amount to a constitutionally prohibited prior restraint. See *Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980). But it is not necessary to address that issue here, for it was not the prior approval policy which gave rise to Azeff's suspension. On these facts, then, the traditionally weighty presumption against prior restraint is without application. In addition, given the view of the facts which I adopt, the plaintiff's vagueness argument—though perhaps of some substance in a case where the Superintendent's general prohibition of "controversial" materials was properly subject to challenge—is unavailing as the basis for an assault on the "just cause" standard actually applied to Azeff's suspension. See *Arnett v. Kennedy*, 416 U.S. 134, 158–163, 94 S.Ct. 1633, 1646–49, 40 L.Ed.2d 15 (1974).

Two other matters—one a contention advanced by plaintiff and the other a contention advanced by defendants—also warrant brief mention: (1) plaintiff claimed at the outset that he had been suspended for having written a

letter to the Governor. It is plain, however, that this was not the basis for, or a factor in, the disciplinary decision. Rather, it was the distribution of the letter at the prison itself which provided the sole impetus for Azeff's suspension. (2) Conversely, there is no basis for defendants' characterization of the decision to suspend as tied to a breach by Azeff of the Commonwealth—A.F.S.C.M.E. agreement. This characterization rests on the argument that the posting of materials of a political or controversial nature, or materials detrimental to the labor-management relationship, on bulletin boards furnished by management as a conduit for the transaction of union business, is conduct prohibited by the terms of the agreement. Tartler testified that he was aware of this prohibition and discussed it with his colleagues before suspending Azeff. But, the record is clear that it was the distribution of the letter generally, of which posting on the bulletin board was but one aspect, which provided the basis for the disciplinary decision.

dismissal of a teacher for having spoken out on a matter of public interest.[6]

The nature of Azeff's employment and the circumstances surrounding his suspension, suggest state concerns considerably more acute than those present in *Pickering*. The staff of the Board of Probation and Parole occupies space at Graterford prison at the pleasure of the Bureau of Corrections. The continued cooperative relationship between the prison administration and the Board involves delicate questions of inter-agency good will about which Azeff's superiors might properly be concerned. In addition, while Azeff directed his attack at those in managerial positions, and purported to advance his argument in defense of the corrections staff, it was the administration's decision to retain "a full complement of high-salaried social workers, counselors and administrators," at the cost of maintaining a sufficient number of guards to ensure adequate security, which lay at the heart of Azeff's complaint. Thus, the position which Azeff set forth in his letter had the potential of setting one group of employees against another. And, at the very least, the letter might have been expected to affect adversely Azeff's relationship with the treatment staff. Indeed, it was Reid, the supervisor of the treatment staff, who removed the letter from the bulletin board and brought it to the attention of the Superintendent. Reid's concern serves to underscore that there is at stake in the management of a prison a "legitimate governmental interest in the order and security of penal institutions," *Procunier v. Martinez*, 416 U.S. 410, 413–14, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974).

■ To whatever limited extent Azeff's employment might, in ordinary circumstances, have justified the imposition of some restrictions on Azeff's exercise of his First Amendment rights, the legitimate state interests in limiting that speech were clearly compounded during the prison emergency. The killing of Officer Mokychic by a prisoner had brought morale to a low ebb. The prisoners were locked in their cells, and, for as long as they were thus confined, their anger at the prison staff was bound to increase. The entire facility was subjected to a search. Prison employees were put on extended shifts, and leaves were cancelled. The treatment staff was forced into the uncongenial position of having to perform housekeeping chores usually delegated to the prisoners. In precisely the circumstance in which the need for discipline, restraint, and cooperation was highest, the Azeff letter, although not inciting violence or illegal activity, could reasonably have been expected to exacerbate existing tensions within the staff, among staff and supervisors, and between inmates on the one hand and staff and supervisors on the other. The speech of public employees "which could reasonably be expected to have the deleterious effect upon the . . [state's] . . . concerns for efficiency, discipline and morale," *Aiello v. City of Wilmington, et al.*, 623 F.2d 845 at 855 (3d Cir., 1980) is a proper subject of state regulation. These concerns are most compelling at a time of emergency.

■ One additional feature of this case bears heavily on the balance to be reached between Azeff's First Amendment rights and the state's interest in limiting those rights. At issue in *Pickering* was a communication directed to the general public through publication in a newspaper. The Court's opinion in *Pickering* recognized that even speech intended for dissemination to

---

**6.** *Pickering* considered the potential impact on the employment relationship of a letter which had been sent to, and reproduced in, a newspaper. In this case, Azeff's discipline was directed, not at his dissemination of views in a public forum, but at the distribution of his letter in the highly restrictive prison environment in which he was employed. But while the relatively non-public nature of the selected forum bears upon the state's interest and historic preroga-

tives in restricting the speech of its employees, public employees are not without First Amendment rights at the workplace. Cf. *Givhan v. Western Line Consol. School*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). The *Pickering* analysis, which evaluates the effect of the speech in the particular context of its utterance, and the interests of the state-employer as against the First Amendment interests of public employees, continues to control.

the public, and propagated through a public forum, might, in some limited circumstances, provide cause for disciplinary action against a public employee. Here, by contrast, the speech to which the state registered its objection occurred on the job. Azeff was not penalized for attempting to influence the Governor—the addressee of his letter—or for trying to communicate with members of the press or citizens generally. Those avenues of communication remained open, and through them Azeff could, and presumably did, reach his larger audience in Harrisburg and elsewhere. Thus, the limitation which the state in fact imposed on Azeff's freedom to communicate did not contemplate, even temporarily, an absolute ban on public discussion. See *Pell v. Procunier*, 417 U.S. 817, 823–828, 94 S.Ct. 2800, 2804–07, 41 L.Ed.2d 495 (1974).[7]

While the communications of public employees are not without First Amendment protection, the choice of forum and audience "may in some situations bring additional factors to the *Pickering* calculus." *Givhan v. Western Line Consol. School*, 439 U.S. 410, 415 n.4, 99 S.Ct. 693, 696, n.4, 58

L.Ed.2d 619 (1979). The state's interest in regulating the speech, and indeed the actions, of its employees tends to be at its maximum at the workplace.[8] Certain First Amendment activity may be physically inconsistent with the performance of one's duties. Constant reminders of controversy may distract employees from the task at hand. Finally, at the workplace, the interests of the state as employer may often merge with the state's proprietary interest in designating suitable uses for property under its control.[9]

### III.

Under circumstances of highest tension at Graterford, Institutional Parole Representative Azeff elected to give currency within the institution to a polemic which— whatever its merits and whatever impact its author may have intended—could reasonably be expected to provoke rancor and recrimination among persons who were already stretched to the limit physically and emotionally. Bureau Director Tartler's de-

---

7. In *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the Court considered the availability of alternative channels of communication, in striking a balance between "legitimate policies and goals of the corrections system," 417 U.S. at 822, 94 S.Ct. at 2804, and the First Amendment interests of *prison inmates*. Plaintiff argues here that principles announced in cases like *Pell* are inapplicable to questions involving the First Amendment rights of *prison employees*. But while the impact of, hence the legitimate state concern in regulating, any First Amendment activity may vary with the state's relationship to the particular speaker, this is but one aspect of the familiar principle that all First Amendment balancing is to be delicately geared to the circumstances of the case. (Thus, it is not hard to imagine a circumstance under which there might be an exercise of "First Amendment rights that are not inconsistent with [the] status [of] a prisoner or with the legitimate penological objectives of the corrections system," *Id.*, while identical statements, at the same time and place by a prison employee, would simply be incompatible with his duties as a state functionary.) The state may be required to make accommodations to certain speech, despite the fact that it poses a potential threat to legitimate state interests, depending on the availability, to the speaker, of alternative fora.

8. On the other hand, public employees may on occasion have a particular interest in communicating with their fellow employees at the workplace.

9. Thus, there is little doubt that the prison administration could properly restrict the manner in which the bulletin board, established as an accommodation to the union, and upon which Azeff's letter in fact appeared, might be used.

Defendants have argued that because a prison is not a public forum, Azeff possessed no First Amendment rights within the prison walls. But whatever the permissible scope of state regulation may be in excluding a member of the public seeking access to an historically and reasonably restricted area in order to publicize his views, see, e. g., *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), a somewhat different analysis—indeed, the *Pickering* calculus—must apply when the speaker is a public employee routinely and legitimately permitted within the restricted area in the course of his employment. Cf. *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 512–13 and n.6, 89 S.Ct. 733, 21 L.Ed.2d 733 (1969).

termination that Azeff showed "poor judgment in inflaming or aggravating an already serious situation" is not open to serious quarrel. The penalty imposed—one day's suspension—while modest, was not insubstantial. It was a penalty for communicating, and was to that extent a non-*de minimis* curtailment of Azeff's citizen entitlement to write and speak. But, because Azeff was a citizen exercising public responsibilities in a restricted environment at a time of grave hazard, the curtailment did not infringe upon Azeff's Fourteenth and First Amendment rights.

Wherefore, judgment will enter for defendants.

## APPENDIX

**LOCAL 2455**
**District Council 88**
**American Federation of State, County and Municipal Employees—AFL–CIO**
**Post Office Box 12896, Philadelphia, Pennsylvania 19108**

March 21, 1979

The Honorable Richard Thornburgh
Governor, State of Pennsylvania
Harrisburg, Pennsylvania

Dear Governor Thornburgh:

There is something fundamentally wrong with a system that allows a three-time insane murderer to roam at will through the corridors of a *maximum security prison* with a baseball bat in his hand. There is something criminally wrong with a *maximum security prison* that has more illicit drugs, money, alcohol, homosexuality, rapes, assaults, thefts, stabbings and murders within it's walls than can be found in a medium-sized city. There is something tragically negligent about a *prison* administration that, under severe budget restrictions maintains a full complement of high-salaried social workers, counselors and administrators, while it is unable to properly man the walls or cell blocks with guards, an administration that cowers in fear of a tumorous minority of truculent inmates, easily compromising their employees in the name of public image.

I am outraged by the senseless, brutal murder of my friend and colleague, Captain Felix Mokychic, by an inmate at Graterford prison. But in addition to outrage, I am tormented by the awful realization that his murder, like the other two employee murders that have occurred during the administration of Commissioner Robinson, was the cumulative result of abrogated responsibilities by a seemingly endless parade of crusading social engineers, beginning with the infamous Robert L. Johnson, whose warped sense of social equity has resulted in a defacto coup d'etat by which the inmates have effectively gained control of this Institution.

The death of Captain Mokychic is not an unusual, isolated incident. It is the "reductum ad ultima" of dozens of such incidents that occur daily, and could easily result in the death of an employee or inmate. As a man who must enter Graterford daily to work under these aberrant conditions, and as a Union representative concerned with the welfare of the employees I represent, I plead with you to return our *prisons* to sanity, stability and order. I beg you to replace these starry-eyed effemeral theorists with men and women who understand the fundamental function of a *PRISON*, who recognize the dangers inherent in an Institution where the typical inmate is a multiple offender, with two or three pages of violent criminal behavior to his credit. I implore you to fulfill the promise you made to the Citizens of Pennsylvania, to tirelessly ferret out and eliminate the tainted, bank-

rupt policies and incompetent minions of your predecessor.

Urgently yours,

/s/Gerald J. Azeff
Gerald J. Azeff
Chief Steward
AFSCME; AFL–CIO
Local 2455

GJA: fb
cc: Attny Gen.