Augustus H. EVANS, Jr., Plaintiff,

v.

Lt. Melvin HENNESSY, Defendant.

Civil Action No. 92–640–JJF.

United States District Court, D. Delaware.

June 20, 1996.

Augustus H. Evans, Jr., Georgetown, DE, Pro Se.

Janice R. Tigani, Elizabeth A. Seiter, Deputy Attorney General, Department of Justice, Wilmington, DE, for Defendant.

## MEMORANDUM OPINION

FARNAN, District Judge.

Plaintiff, Augustus H. Evans, is an inmate incarcerated at the Sussex Correctional Institution ("SCI") in Georgetown, Delaware. (D.I. 2). Defendant, Lieutenant Melvin Hennessy, is a Correctional Officer employed at SCI. Mr. Evans filed this lawsuit pursuant to 42 U.S.C. § 1983, alleging that his civil rights were violated by Lt. Hennessy during an incident involving Mr. Evans and Lt. Hennessy. Specifically, Mr. Evans alleges that while he was being moved from his cell for being verbally abusive and attempting to incite other inmates Lt. Hennessy hit him twice in the face with a clenched fist. (D.I. 9). Mr. Evans contends that Lt. Hennessy's action violated his First Amendment Right of free speech, Eighth Amendment right to be free from cruel and unusual punishment and Fourteenth Amendment right to due process. (D.I. 9).

A bench trial was held on this matter, and this Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law.

## I. BACKGROUND

### A. THE ADMINISTRATIVE SEGREGATION DETAINMENT AREA

SCI has an Administrative Segregation Detainment Area ("ASDA") that houses prisoners who are on "lockdown." (Trans. at p. 32). The ASDA has three separate holding areas that contain both individual cells and a small common area for the inmates housed in that particular ASDA unit. (Id.). ASDA Units # 1 and # 2 each contain four individual cells that are positioned side-by-side and open onto a common area that is approximately 12 feet wide and 20 feet long. (Trans. at p. 32, 46). ASDA Unit # 3 contains three individual cells, also positioned side-by-side and opening onto a common area. (Id.).

The three ASDA units are positioned side-by-side and each unit has one door that opens from the unit common area onto the ASDA hallway. (Trans. at p. 45). The doors to Units # 1 and # 2 have a small window approximately six inches by four inches and the door to Unit # 3 has a substantially larger window. When a disturbance involving an inmate occurs in the ASDA hallway, the windows to Units # 1 and # 2 are covered in order to prevent other inmates from

observing the disruption and becoming unruly. (Trans. at p. 47).[1]

The ASDA hallway is approximately 15 feet wide and 60 feet long. A guard post measuring approximately 10 feet wide is located directly across from ASDA Unit # 3. As a result, the portion of the ASDA hallway located between Unit # 3 and the guard post is approximately 5 feet wide. (Trans. at p. 63). At one end of the ASDA hallway are steel doors that lead to the SCI dining area, and at the other end of the hallway are steel doors leading to the institution's medical offices. (Trans. at pp. 63, 84).

## B. MR. EVANS' PREVIOUS BEHAVIOR

Mr. Evans testified that he is outspoken and on several occasions has protested when he perceived that he was being treated inappropriately by SCI employees. (Trans. at pp. 33, 119). For example, Mr. Evans testified that he protested and filed grievances when: 1) institutional food servers failed to wear plastic gloves when handling inmates' food; 2) correction officers allegedly referred to inmates as "boy" or other inappropriate and derogatory euphemisms; and 3) a nurse employed at the institution acted rudely towards him. (Trans. at pp. 69, 75).

Correctional Officer Cropper and Corporal Johnson testified that Mr. Evans is a vocal inmate who is often verbally abusive to both prison employees and other inmates. (Trans. at pp. 33, 119). Officer Cropper further testified that on a normal day, Mr. Evans is loud and verbally abusive, and on a bad day his abusiveness escalates. (Trans. at p. 39). Inmate James Cecil also testified that Mr. Evans has "a big mouth" and "is definitely a troublemaker." (Trans. at pp. 14, 18). Additionally, Corporal Johnson testified that Mr. Evans has engaged in physical confrontations with other inmates, although he has never physically assaulted an institutional employee. (Trans. at pp. 75, 119).

## C. THE INCIDENT OF SEPTEMBER 26, 1992

On September 26, 1992, Mr. Evans was housed in ASDA Unit # 1, cell # 1, Corporal Curtis Johnson was on duty in the ASDA Guard Post and Correctional Officer Charles Wood was on duty patrolling the ASDA units. (Trans. at p. 44). At approximately 4:00 p.m., Mr. Evans asked Officer Wood to turn off his cell light. (D.I. 9). The light was not turned off. Over the next four or five hours, Mr. Evans asked approximately seven times for his cell light to be turned off. (D.I. 9); (Trans. at p. 75). During this period, Mr. Evans became increasingly loud and verbally abusive and began rousing other inmates by pounding on the cell walls and door. (Trans. at pp. 43, 45, 99–100).

At approximately 9:00 p.m. Officer Woods entered Mr. Evans' cell and a verbal argument ensued. (D.I. 9). Officer Woods testified that Mr. Evans was yelling and using abusive language and that the other inmates were pounding on the outer ASDA Unit # 1 door. (Trans. at pp. 99–100). Corporal Johnson testified that he could hear Mr. Evans yelling and cursing at Officer Woods and was concerned that the disturbance was escalating and other inmates might become involved. (Trans. at p. 43). As a result of this concern, Corporal Johnson testified that he telephoned Lt. Hennessy, who was stationed outside of the ASDA in the Control Center, informed him of the situation and requested permission to move Mr. Evans to a cell in ASDA Unit # 3. (Trans. at pp. 48, 83). Correction Officer Calvin Cropper, who was assigned as a P–4 Officer outside of the ASDA Unit, was also called to the location.[2] (Trans. at 33, 38).

Corporal Johnson testified that after calling Lt. Hennessy and Officer Cropper, he and Officer Wood instructed Mr. Evans to pack his personal belongings because he was being moved to ASDA Unit # 3. (Trans. at p. 49). Corporal Johnson also testified that while Mr. Evans was packing his belongings

---

1. Corporal Johnson testified that the window on the door to ASDA Unit # 3 is too large to be covered. (Trans. at p. 47).

2. Based on the testimony of Officer Cropper, the Court understands the term P–4 Officer to mean that Officer Cropper was assigned as a Patrolling Officer responsible for Area 4 of the prison. (Trans. at p. 38).

he did not make any attempt to physically assault either Corporal Johnson or Officer Wood, although he continued to curse them and to be verbally abusive. (Trans. at p. 48).

Lt. Hennessy arrived after Mr. Evans had finished packing his belongings and was standing in the cell doorway. (Trans. at pp. 49, 60, 67). Mr. Evans was then moved into the ASDA hallway in order to be strip-searched and to have his belongings searched.[3] While being moved into the hallway, Mr. Evans did not physically threaten any of the correctional officers, but he continued to be verbally abusive. (Trans. at pp. 48–49).

All witnesses testified that after exiting ASDA Unit # 1 and entering the ASDA hallway, Mr. Evans stood with his back against the hallway wall with his personal belongings in a laundry-style bag laying on the floor to his right. (Trans. at p. 67). Lt. Hennessy testified that he stood approximately three feet in front of Mr. Evans and Corporal Johnson and Officer Cropper were standing on Lt. Hennessy's left, preparing to search Mr. Evans' belongings. Lt. Hennessy further testified that when he attempted to ask Mr. Evans what his problem was Mr. Evans became verbally abusive, increasingly agitated and began waving his hands in the air. (Trans. at p. 61, 86). As a result of Mr. Evans' conduct, Lt. Hennessy testified that he felt threatened and decided to handcuff Mr. Evans. (Trans. at p. 86). Lt. Hennessy testified, and Corporal Johnson and Officer Cropper concurred, that as Lt. Hennessy grabbed Mr. Evans' right arm in an effort to secure Mr. Evans in order to handcuff him, Mr. Evans turned his body and pulled away causing him to fall over the laundry bag. (Trans. at pp. 88, 112–113, 121). As a result, Mr. Evans allegedly injured his back.

For his part, Mr. Evans testified that in response to Lt. Hennessy's questioning he began to give an expletive filled answer concerning Officer Wood and Corporal's Johnson failure to turn off his cell light. (Trans. at p. 68). Mr. Evans stated that while he was answering the question, Lt. Hennessy struck him on the left side of his face two times.

(*Id.*). Mr. Evans further testified that as a result of Lt. Hennessy's two blows, he tripped over his bag of personal belongings, fell and injured his back. (*Id.*).

Mr. Evans' testimony is substantially supported by the testimony of inmate James Cecil, who was housed in ASDA Unit # 2 and was standing in the Unit # 2 common area when the incident between Mr. Evans and Lt. Hennessy occurred. Mr. Cecil testified that he was looking out of the Unit # 2 window and saw Lt. Hennessy strike Mr. Evans two times. Mr. Cecil also testified that when the correctional officers noticed that he was watching the altercation they covered the window of the Unit # 2 door.

## D. WHEN WERE THE WINDOWS COVERED?

There was contradictory testimony concerning when the window to ASDA Unit # 2 was covered in order to prevent other inmates from observing the disturbance. Lt. Hennessy testified that the windows were covered before he arrived at Mr. Evans' cell. (Trans. at p. 59). The Lieutenant testified that earlier in the day inmates from other areas of the institution had been ushered through the ASDA hallway in order to reach the medical center. (*Id.*). Lt. Hennessy testified that the windows had been covered in order to prevent the inmates entering the medical center from inciting the inmates housed in the ASDA Units. (*Id.*).

Lt. Hennessy's testimony was not supported by the testimony of the other correctional officers, none of whom testified that the windows had been covered earlier in the day. Officer Wood testified that he covered the windows after Mr. Evans became abusive, but before he was moved into the hallway. (Trans. at p. 98). Officer Wood, however, also testified that he was the last person to leave Mr. Evans' cell and that upon leaving the cell he began changing the Unit roster boards. (Trans. at p. 98–99).

Corporal Johnson testified that he believed the windows were covered after Mr. Evans

---

**3.** It is standard institutional procedure when moving a prisoner between cells to search both the prisoner and his personal belongings. (Trans. at pp. 73, 93).

was removed from his cell. (Trans. at p. 48). Corporal Johnson's memory is supported by the testimony of both Mr. Cecil and Mr. Evans. Mr. Cecil testified that he watched the altercation through the Unit # 2 window, which was not covered until after the altercation was over. (Trans. at p. 17). Mr. Evans also testified that while he was standing in the hallway he saw that the Unit # 2 window was not covered. (Trans. at p. 72).

Based upon the contradictory testimony of Lt. Hennessy and Officer Wood, the Court credits the testimony of Mr. Evans, which is supported by both Corporal Johnson and inmate Cecil. Accordingly, the Court finds that the window to ASDA Unit # 2 was not covered until after the altercation between Lt. Hennessy and Mr. Evans occurred. Therefore, the Court finds that Mr. Cecil was able to witness the incident before the window was covered and will accordingly credit his testimony.[4]

## E. WHERE IN THE HALLWAY DID THE ALTERCATION OCCUR?

■ Lt. Hennessy testified that Mr. Evans was standing near ASDA Unit # 3 and the Guard Post when the alleged altercation occurred. (Trans. at p. 85). Lt. Hennessy further testified that due to the distance and extreme angle, it is almost impossible for a person looking out of the ASDA Unit # 2 window to see this location. (Trans. at p. 89). Therefore, if the incident took place where Lt. Hennessy alleges, it would have been virtually impossible for an inmate in Unit # 2 to witness Mr. Evans laying on the floor. Additionally, because it is even further from the location Lt. Hennessy describes, it would have been impossible for an inmate in Unit # 1 to see the altercation.

As previously discussed, Corporal Johnson testified that the purpose of covering windows is to prevent inmates from witnessing disturbances that occur in the hallway. (Trans. at p. 47). Therefore, if the disturbance occurred where Lt. Hennessy alleges,

at a location where the inmates could not see what was happening, there would be no reason to cover the windows because the inmates would not have been able to see. Consequently, the Court finds that Lt. Hennessy's testimony is not credible on the issue of where the altercation occurred.

The Court credits the testimony of Mr. Evans, who testified that the incident occurred in the hallway directly across from Unit # 2. (Trans. at p. 67). This testimony is supported by Mr. Cecil, who testified that he was able to see the altercation through the Unit # 2 window. Additionally, the fact that the correctional officers ultimately covered the Unit # 1 and # 2 windows supports the finding that the altercation occurred in a location visible to the inmates housed in Units # 1 and # 2.

Because the Court finds that the altercation occurred in the hallway across from Unit # 2 and that the window to Unit # 2 was not covered until after the altercation occurred, the Court credits the testimony of Mr. Cecil. Mr. Cecil testified that Mr. Evans is a troublemaker who was verbally abusive to Lt. Hennessy, Corporal Johnson and Officer Wood. (Trans. at p. 18). Additionally, he testified that he considers Lt. Hennessy to be "a good guy" who had never mistreated him. (Trans. at p. 14). Nevertheless, Mr. Cecil further testified that Mr. Evans was not physically abusive to the correctional officers, and that he saw Lt. Hennessy hit Mr. Evans while they were in the hallway. (*Id.*).

Based on all of the evidence, the Court finds that Mr. Evans became extremely agitated when his cell lights were not turned off in a timely manner. The Court further finds that Mr. Evans was verbally abusive towards correctional officers and also attempted to incite other inmates. The Court also finds that the altercation between Lt. Hennessy and Mr. Evans occurred in the hallway across from Unit # 2 and was witnessed by inmate Cecil. Finally, the Court finds that Mr. Evans did not physically assault, attempt

---

4. Initially, upon direct examination, Mr. Cecil was hesitant to testify about the events of September 26, 1992 because he was afraid of retribution by the SCI staff. (Trans. at p. 17). After instruction from the Court that the law both requires truthful testimony and protects against retribution, Mr. Cecil testified in accordance with the statement he had given after witnessing the incident. (Trans. at pp. 11, 24).

to assault, or threaten Lt. Hennessy in any manner justifying the use of physical force by Lt. Hennessy against Mr. Evans. Thus, without justification or reasonable apprehension of physical harm, the Court finds that Lt. Hennessy struck Mr. Evans two times in the head with a closed fist.

### F. THE FIRST AMENDMENT CLAIM

Mr. Evans' alleges that Lt. Hennessy violated his First Amendment right of free speech. (D.I. 9). The Court construes the allegation to contend that Mr. Evans' First Amendment rights were violated because he was moved as a result of his verbal assault on Officer Wood and Corporal Johnson.

■ It is well established that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). Further, although incarcerated, inmates retain protections afforded by the First Amendment. *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Nevertheless, the Supreme Court has stated that "incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1059–60, 92 L.Ed. 1356 (1948). These limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives, such as institutional security. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987), citing *Pell v. Procunier*, 417 U.S. 817, 822–823, 94 S.Ct. 2800, 2804–2805, 41 L.Ed.2d 495 (1974). Therefore, a prisoner's exercise of First Amendment freedoms may be curtailed when it poses a "likelihood of disruption to prison order or stability." *Wilson v. Schillinger*, 761 F.2d 921, 925 (3d Cir.1985), citing *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 132, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977).

Several witnesses testified that Mr. Evans was both verbally abusive to the correctional officers and attempting to incite other inmates. Mr. Cecil testified that Mr. Evans was yelling in an attempt to incite Corporal Johnson and Officer Wood and was also throwing wet toilet paper at the Unit wall. (Trans. at p. 18). Additionally, Corporal Johnson testified that inmate Nelson Hoover, housed in Unit # 1 with Mr. Evans, had also started banging on the unit walls and door. (Trans. at p. 45). Mr. Evans' own testimony concedes the fact that he was verbally abusive to correctional officers and was making a lot of noise.

■ Based on this testimony, the Court finds that Corporal Johnson sought to move Mr. Evans in an attempt to prevent other inmates from becoming riotous. Accordingly, because maintenance of order is a valid and legal objective of inmate supervision, the Court concludes that the effort to relocate Mr. Evans was an attempt to prevent him from disrupting good order and inciting other inmates and did not constitute a violation Mr. Evans' First Amendment right of free speech.

### G. THE DUE PROCESS CLAIM

Under the Fourteenth Amendment to the Constitution, no state may deprive a person of life, liberty or property without due process of law. The United States Supreme Court has held that prison officials have broad administrative and discretionary authority over the institutions they manage and lawfully incarcerated persons retain only a narrow range of protected liberty interests. *Hewitt v. Helms*, 459 U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Therefore, "[a]s long as the conditions of degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmates's treatment by prison authorities to judicial oversight." *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976).

Additionally, the United States Supreme Court recently re-examined the issue of when a state can create liberty interests in prisoners that are protected under the Due Process Clause. *Sandin v. Conner*, —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The

Supreme Court held that state created liberty interests are generally limited to freedom from restraints which pose an "atypical and significant" hardship on the inmate in relation to ordinary prison life. *Id.* at ——, 115 S.Ct. at 2301. The Supreme Court found that discipline by prison officials in response to prisoner misconduct falls within the expected parameters of the sentence imposed by a court of law and constitutes an element of ordinary prison life. *Id.* Additionally, the Supreme Court noted that punishment through segregated confinement is not the type of atypical significant deprivation that creates a liberty interest protected under the Due Process Clause. *Id.*

In the instant action, Mr. Evans alleges that the actions taken by Lt. Hennessy violated his Fourteenth Amendment right of due process. The Court construes Mr. Evans' claim as alleging that Lt. Hennessy transferred him to the ASDA Unit # 3 as a result of his verbally abusive behavior without an administrative hearing. The facts demonstrate, however, that at the time of the incident Mr. Evans was already housed in the ASDA lockdown unit. (D.I. 9). Therefore, Lt. Hennessy's did not transfer Mr. Evans into a more restrictive unit, but only moved him away from other prisoners and closer to the guard post. As a result, the Court concludes that Lt. Hennessy's actions did not deprive Mr. Evans of a constitutionally protected liberty interest.

## H. THE EIGHTH AMENDMENT CLAIM

Mr. Evans alleges that Lt. Hennessy violated his Eighth Amendment right to be free from cruel and unusual punishment. (D.I. 9). The Court interprets this claim to contend that Lt. Hennessy used excessive physical force when he struck Mr. Evans, thus violating Mr. Evans' Eighth Amendment rights. .

The United States Supreme Court has held that whenever prison officials are accused of using excessive force in violation of an inmate's Eighth Amendment rights, the core judicial inquiry is "whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sa-

distically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992), citing *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). The Supreme Court has further held that the use of excessive physical force against an inmate may constitute an Eighth Amendment violation even though the inmate does not suffer serious injury. *Hudson v. McMillian,* 503 U.S. at 4, 112 S.Ct. at 997.

Lt. Hennessy testified that he felt threatened when Mr. Evans began waving his hands in the air. (Trans. at p. 61). It is clear from the evidence adduced at trial, however, that Mr. Evans made no attempt to physically assault any of the prison employees he argued with on September 26, 1996. Both Corporal Johnson and Officer Wood testified that while Mr. Evans was verbally abusive he never became physically abusive. Additionally, Mr. Cecil testified that while Mr. Evans appeared to be trying to incite Officer Wood and Corporal Johnson, he did not physically provoke Lt. Hennessy and never attempted to strike Lt. Hennessy. (Trans. at pp. 20, 13). Additionally, at the time that Lt. Hennessy struck Mr. Evans, Mr. Evans was backed against the hallway wall and was surrounded by at least three correctional officers. Therefore, the Court concludes that Lt. Hennessy did not act in a good-faith effort to restore control but rather maliciously sought to harm Mr. Evans. As a result, the Court concludes that Lt. Hennessy violated Mr. Evans' Eighth Amendment rights.

## I. DAMAGES

After Mr. Evans was struck by Lt. Hennessy and fell to the floor, Nurse Chere Riordan was called to the scene. Nurse Riordan testified that Mr. Evans was moving his arms and legs and refused to allow her to touch him. (Trans. at pp. 126–127). Nurse Riordan also testified that Mr. Evans did not complain about pain in his face or jaw on either September 26, 1992 or the following day when he visited the medical center. (Trans. at p. 131). Nurse Riordan further testified that Mr. Evans had visited the medical center complaining of back pain prior to September 26, 1996. (*Id.*). Nurse Riordan

testified that Mr. Evans told the medical staff that he had injured his back during a basketball game as far back as 1989. (*Id.*).

Dr. Benjamin Robinson, M.D., is a Doctor of Medicine employed by Correctional Medical Services since 1986. (Trans. at p. 139). Dr. Robinson testified that he examined Mr. Evans on October 2, 1992 and concluded that he had a fibromyositis of the lumbar spine, essentially a soft-tissue injury consistent with a muscle strain or sprain. (Trans. at p. 141). Dr. Robinson further testified that Mr. Evans told him that he had injured his back in a basketball game on September 20, 1992 and had reaggravated the injury in a fall on September 26, 1992. (Trans. at p. 142). Dr. Robinson also testified that Mr. Evans had sought medical treatment for back pain as early as 1989. (*Id.*). Finally, Dr. Robinson testified that he believed that Mr. Evans' injury occurred as early as 1989, that the injury is not debilitating, and that precipitating events reaggravate the injury causing temporary discomfort. (Trans. at p. 141).

The Court credits the testimony of Dr. Robinson and finds that Mr. Evans' back injury originated prior to September 26, 1992, but was reaggravated when he fell over his personal belongings after being struck by Lt. Hennessy. The Court further finds that the back injury causes Mr. Evans periodic discomfort. Additionally, the Court concludes that violation of Mr. Evans' Eighth Amendment right constitutes damage per se. As a result, the Court concludes that Mr. Evans is entitled to a damages award in the amount of $7500.00.

## II. *CONCLUSION*

The Court finds that the Defendant, Lt. Melvin Hennessy, struck the Plaintiff, Augustus Evans, two times with a closed fist. The Court concludes that Lt. Hennessy's actions constituted excessive physical force and violated Mr. Evans' Eighth Amendment right to be free from cruel and unusual punishment. The Court further finds that Lt. Hennessy's illegal conduct reaggravated Mr. Evans' pre-existing back injury, causing periodic discomfort. As a result of the Eighth Amendment violation and reaggravated back

injury, the Court awards Mr. Evans damages in the amount of $7500.00.