**Beverly SIDEBOTTOM,
et al., Petitioners,**

v.

**Dora SCHIRIRO, et al., Respondents.**

**No. 4:96 CV 844 SNL.**

United States District Court,
E.D. Missouri,
Eastern Division.

May 22, 1996.

Mary B. Schultz, Associate, Descher and Schultz, St. Louis, MO, for plaintiffs.

Erwin O. Switzer, III, Partner, Gretchen E. Rowan, Attorney General of Missouri, Assistant Attorney General, St. Louis, MO, for defendants.

## MEMORANDUM AND ORDER

LIMBAUGH, District Judge.

Petitioners are before this Court for a Preliminary Injunction.[1] They initially sought a Temporary Restraining Order but the Court took it under advisement pending a prompt hearing to establish a clear factual record. The Petitioners, inmates and the reporters who want to take video cameras into correctional institutions to interview them, have asked this Court to order the Respondents to lift a temporary stay which has been placed on interviews. The Court must decide whether the Respondents' decision to impose a stay on face to face video interviews of media-selected inmates violates the Petitioners' constitutional rights?

The facts giving rise to this suit have developed over the last several months while the Petitioners have conducted interviews in correctional institutions throughout Missouri. Each one of these video interviews has required previous clearance, a security search of the reporter and his equipment, and a meeting with the reporter and the inmate in a controlled setting.[2]

The Petitioners argue that their reporters' interviews should be allowed because they are no more intrusive on prison life than other prison visitors. On visiting days, the institutions host a number of members of the general public. Although numbers vary based on the institution and the day of the week, the number of visitors can be as few as ten a day to as many as fifty a day on weekends. Visitors include inmates' family members, friends, and clergy. Each one of these visitors is only allowed to enter the facility after he is placed on an approved visitor list, searched for contraband, and taken to an approved visitor area. No public visitor, however, is allowed to take video or still cameras into the visiting area.[3]

The state claims that the Petitioners' interviews pose a security risk and that their number, nearly seventy requests in the last four months (Pet. exs. 10–13), has become an unwieldy burden. Any task which directs staff attention away from its mission of running a prison presents a security risk. Interviews and the presence of media can increase this risk and act as an unnecessary catalyst in the delicate prison environment. Mr. Lombardi, Director of the Division of Adult Institutions who has great familiarity with this subject given his number of years of service and his educational background, testified about two incidents of prison unrest in the state of Missouri which were exacerbated by the presence of media. He also expressed concern that the increased notoriety that would necessarily come to an inmate from an appearance on television could give that inmate an enhanced role in the general population and allow him to exercise that power in a predatory fashion.

As a result of these safety concerns, the Department has put a stay on interviews until they can meet with the Petitioners to determine the parameters and the extent of the Petitioners' demand for future interviews. (Pet. Ex. 20).

The Petitioners allege that the Department's decision to stay interviews has violated a number of provision of the Constitution. First, they allege that there has been a violation of the First Amendment rights of the

---

**1.** At the Petitioners' request, the Court has suspended the local rule combining preliminary and permanent injunctions due to counsel's perceived need to conduct further investigation.

**2.** There have been no reported incidents of violence or breach of security regulations as a result of these past interviews.

**3.** Mr. James Barnes testified that JCCC has a staff photographer who can take still photos of inmates and family members.

reporters and the inmates. Second, the Department's decision to ban Beverly Sidebottom, the mother of a former inmate whose capital sentence was carried out in November of 1995, violates her rights and the rights of the station to choose its reporters. Third, the Petitioners' procedural due process rights were violated because the stay was imposed without notice to the inmates or an opportunity for their comment. Fourth, Petitioners' equal protection rights were violated because other members of the media are not subject to this stay and it does not apply to the general public. Finally, the Petitioners cloak their entire action in 42 U.S.C. § 1983.

■ The Court must look to established doctrine to determine if the facts and allegations of the case require an injunction. In *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109, 113 (8th Cir.1981), the circuit court outlined the four factor test that must be applied: "Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movants; (2) the state of balance between this harm and the injury that granting the injunction will inflict on the other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."

### Movants Probability of Success on the Merits

■ Because the analysis of the first two harm elements is intertwined with an analysis of the likelihood of success element, this Court will begin its analysis with the third prong. The question presented is whether the news media have a constitutional right of access to prison, over and above that of the general public, to interview inmates and make sound and video recordings of those interviews for publication through television broadcasts.

■ To put the question in context, the Court is mindful of the longstanding principle that "lawful incarceration brings about the necessary withdrawal or limitations of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). This is not to say that inmates are stripped of all right, only those which conflict with legitimate state interests. As an additional preliminary note, Respondents are given deference on many matters because courts are ill suited to deal with the problems of prison administration and must often defer to the knowledge of expert administrators. *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

Having established the fundamental framework, the Court turns to the specific legal analysis that is required. The Supreme Court has found that the news media has no greater rights in a prison setting than the general public. In a California case similar to this matter, *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the state had enacted a regulation which prohibited face to face interviews with inmates of the reporters choice. It did however, allow inmates to be interviewed at random and allowed the media to tour prisons to gather information for news reports. The Supreme Court found that the restriction was constitutional based on penological interests and that it was a reasonable restriction since inmates still had other access to media through letters or through visitors relating their stories to the media. During the same term, the Supreme Court applied that reasoning to a similar Federal Bureau of Prisons' regulation. *Saxbe v. Washington Post Co.,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974).

■ The case before the Court today is less restrictive than the approved California regulation or the Federal Bureau of Prisons' regulation. There has been no evidence, either filed with the Court or presented as testimony during the hearing, which would indicate that reporters are not given the same rights of access as other visitors and could not enter these state institutions under the same guidelines. Unlike the *Pell* and *Saxbe* cases, reporters may be placed on visitor lists, searched, and admitted to speak to any inmate who will agree to see them. In fact, one of the Petitioners is already on the visitor list of an inmate. Presumably he

could be placed on the visitor list of any inmate who wished to see him and he would be allowed the same visiting rights as any other visitor. The prohibition which is in effect now only forbids reporters from visiting and conducting face to face video interviews with inmates. As in the other cases, there are alternative methods of communication available. Inmates in Missouri are allowed to contact reporters through the mail or by telephone. Petitioners admit that they have conducted two interviews over the phone; because their recording quality was inferior and a Department of Corrections notice periodically interrupted the conversation however, the phone interviews were not optimal programming.[4]

There is nothing to indicate that the security reasons put forth for the stay are a pretextual attempt to create an unconstitutional regulation on the content of speech. Before the stay was imposed, the state approved the interview of an inmate who is critical of the Department of Corrections and who has promised to expose corruption within the Department. The Petitioners have chosen not to interview that inmate.

The administrative demands that Petitioners' requests have placed on the Respondents are burdensome. A limited number of staff must review each request, check with the Superintendent of the particular institution, obtain a waiver from the inmate to allow for the meeting, admit the reporter to the institution in accordance with regulations, and staff the visiting room. Although an individual staff member has not been required to supervise each interview, any time taken away from the primary mission of the institution is a loss of staff time which poses a risk to the institution's security. Some risks associated with visitors are tolerated because they have a legitimate rehabilitative component or they promote discipline and good order, but the large number of media requests have presented an unacceptable risk level.

The argument put forth by the Petitioners to discard Supreme Court precedent and ignore the administrators' concerns is not compelling so there is no likelihood of success on the merits.

The next question put forth is whether the Department's decision to refuse admittance to the mother of an executed inmate is a violation of her first amendment rights as a reporter and a violation of her equal protection rights. This claim has no likelihood of success either. Once again, the Court will defer to the expert administrators because the Court can see obvious security risks posed by her mere presence in a Missouri prison. Her status as a reporter for the Petitioner does not give her any greater rights than she would have as an individual. Either as a visitor or a reporter, Beverly Sidebottom's presence in prison could trigger problems which can be avoided by this proactive step. A prison official is an expert who can anticipate problems and need not wait until tragedy before he act. *Hamilton v. Schriro*, 74 F.3d 1545 (8th Cir.1996).

The Petitioners' due process claim has no likelihood of success either because inmates are only provided due process for those things expected in prison. It is not typical to appear on television while incarcerated nor is that unexpected of prison confinement. Accordingly, there is no due process violation. *Sandin v. Conner*, —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In addition, the Petitioners could not point to any regulation which gave the inmate a due process right to be on television through the use of mandatory language such as "shall" "will" or "must". *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).

Likewise, the equal protection claim of the Petitioners has no likelihood of success. Uncontradicted testimony was elicited during the hearing which established that the Department's stay on face to face interviews applies to all media. The Department's General Counsel testified that the reason the Petitioners were the only ones notified about the current stay was because they are the only station that has sought to conduct these interviews and that if any oth-

---

4. In a recent trial before this Court, an incarcerated criminal defendant gave a phone interview which was broadcast by the local CBS affiliate.

er station were to inquire, they would be told about the stay as well. In order to establish a claim for an equal protection violation, the Petitioners must show that they have been accorded treatment invidiously dissimilar from that accorded to others, with no rational basis existing for the difference in treatment. *Flittie v. Solem,* 827 F.2d 276 (8th Cir.1987). Petitioners have failed to demonstrate in any way that they have been accorded treatment invidiously dissimilar from that accorded to others.

Finally, because the Court finds no constitutional violations, Petitioners have no likelihood of success under 42 U.S.C. § 1983. Although there is no question that the Respondents are state actors, their actions do not give rise to a claim.

### Harm Elements

■ As the preceding discussion indicates, the Petitioners are not harmed by the decision to deny the injunction because there is no violation of any of their legal rights. In contrast, the harm that could result from granting the injunction is great. Expert administrators like Mr. Lombardi who run the state's correctional institutions have implemented this temporary stay to establish procedures that will prevent any serious potential incidents.

### Public Interest

The Court's findings that the Petitioners have no likelihood of success on the merits and that harm could result from granting the Petitioners' request could provide the sole support for this decision. That is not the only reason however, that this injunction will be denied. The public interest associated with this issue also urges denial of the injunction. It is certainly within the public's interest that Missouri's prisons run in an orderly fashion. Without order and discipline in a prison environment, the state will not be able to accomplish its mission of rehabilitation. Because an overwhelming majority of inmates will someday return to life as members of the general public, rehabilitation is vital and anything that hinders that process is against the public interest.

Accordingly,

**IT IS HEREBY ORDERED** that the Petitioners' Motion for a Temporary Restraining Order is **DENIED.**

**IT IS FINALLY ORDERED** that the Petitioners' Motion for a Preliminary Injunction is also **DENIED.**