Dear Senator Shurden,
¶ 0 This office has received your request for an Attorney General Opinion. You have asked, in effect, the following questions:
1. Under the Oklahoma Prison Overcrowding Emergency Powers Act,Sections 57 O.S. 570 through 57 O.S. 576 of Title 57,which mandates extra time credits be given toward an earlierrelease, can the Department of Corrections include beds availableunder contract or lease from private prisons in determiningwhether a state of emergency exists in the prison system?
2. In calculating whether an emergency exists under the OklahomaPrison Overcrowding Emergency Powers Act, Sections 570 through576 of Title 57, which mandates extra time credits be giventoward an earlier release, is the Department of Correctionsallowed to utilize prisoner bed space in private prisons beforecompletely filling beds within state-operated prisons, therebyfailing to trigger the Act?
3. If the prison population in a facility designated as onelevel of security exceeds 95 percent of capacity, but the prisonpopulation in another facility with a different level of securitydoes not exceed 95 percent of capacity, does a state of emergencyexist which would mandate extra time credits toward early releaseunder the Oklahoma Prison Overcrowding Emergency Powers Act?
4. Is the formula used for calculating the population of theprison system adopted by the State Board of Corrections withoutcomplying with notice and filing requirements of theAdministrative Procedures Act valid and legally sufficient fordetermining whether a state of emergency exists in the prisonsystem?
¶ 1 The Oklahoma Prison Overcrowding Emergency Powers Act ("the Act"), 57 O.S. 576 (1991-1998), sets forth a procedure to be used to prevent overcrowding within Oklahoma's prison system. Under the Act, the State Board of Corrections ("the Board") first certifies the capacity of the prison system. Once capacity is certified, when the prison population exceeds 95% of the prison system's capacity for 30 consecutive days the director of the Department of Corrections ("the Department") must notify the governor and request that a state of emergency be declared. Unless the governor finds that a state of emergency does not exist within 15 days of notification, a state of emergency exists and the provisions of the Act go into effect. See 57 O.S. 572
(1991). On the effective date of the emergency, the director of the Department is required to grant 60 days of emergency time credit to most inmates.[1] See 57 O.S. 573 (1991). If this action does not reduce the prison population to a level below 95% of capacity, the director is required to grant another 60 days of emergency time credit. See 57 O.S. 574 (1991). Under the Act, this procedure continues until the capacity of prisons falls below 95%; however; no inmate eligible for the time credits is allowed to receive more than 360 days of emergency time credit per year.
 I.
¶ 2 In your first question, you ask whether the Department is allowed to count beds in private prison facilities leased by the Department in calculating whether the trigger of 95% capacity has been reached. If the Department is allowed to count such private beds, the prison capacity is larger, and the prison population must be correspondingly higher before the 95% capacity mark is reached.
¶ 3 As is implicit in your question, the Act centers around what constitutes "capacity." That term is defined in the Act as "the actual available bedspace as certified by the State Board of Corrections subject to applicable federal and state laws and the rules and regulations promulgated under such laws." 57 O.S.571(1) (1998). The key words for purposes of this discussion are "actual available bedspace," i.e., whether the Board has the authority to determine whether private prison bedspace is "available" within the prison system in calculating capacity.
¶ 4 The Department of Corrections is charged with establishing or maintaining such institutions "as are necessary or convenient" to operate programs "for the education, training, vocational education and rehabilitation of prisoners" under the Department's jurisdiction. 57 O.S. 504(b)(2) (1991). The Department is also authorized to "enter into contracts with private prison contractors."[2] See 57 O.S. 504(b)(7) (1991). Therefore, if the Department finds it "necessary or convenient," it can contract with private prison contractors to house, care and control inmates under its jurisdiction, provided the inmates are classified as medium security or lower.
¶ 5 The Department has wide discretion in determining what to do with the inmates assigned to it. The Legislature has stated its intent as to how an inmate is to be transferred to the Department's control. See 57 O.S. 530 (1998).[3] Beyond that, the statutes do not dictate to the Department how to care for its prisoners. See Bell v. State, 381 P.2d 167, 173
(Okla.Crim. 1962) ("the incarceration of a convict is one of administration for an arm of the executive branch of government."). See also Fields v. Driesel, 941 P.2d 1000, 1007
(Okla.Crim. 1997) (quoting Care and Protection of Jeremy,646 N.E.2d 1029, 1033 (Mass. 1995), the court observed that "[w]here the means of carrying out a statutory duty is within the discretion of the public official, courts normally will not direct how the public official should exercise that statutory duty. . . . It is clear that the Oklahoma Legislature intended to place the power to operate the prisons and to incarcerate its inmates in the hands of the Department of Corrections."). The rationale for deference has also been enunciated by the United States Supreme Court:
 [T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.
Turner v. Safley, 482 U.S. 78, 84-85 (1987) (quotations omitted).
¶ 6 This same philosophy was echoed by at least one federal appeal court, which observed that the Supreme Court has emphasized what is "the animating theme of the Court's prison jurisprudence for the last 20 years: the requirement that judges respect hard choices made by prison administrators." Johnson v.Phelan, 69 F.3d 144, 145 (7th Cir. 1995) (citations omitted).
¶ 7 This wide discretion, combined with the Department's authority to contract with private prisons to lease bedspace for inmates, leads to the conclusion the Department has the power to include these leased private prison beds in determining what constitutes "actual available bedspace" within the prison system. If the Department has the power to determine that "actual available bedspace" includes leased private prison beds within the prison system, it has the power to count those leased beds in determining whether 95% of capacity has been reached in triggering the provisions of the Act.
 II.
¶ 8 This discussion also answers your second question. If the Department has discretion in determining whether leased private prison beds are used, it also has discretion to make a decision which results in private beds being filled, while beds in state-owned prisons are unoccupied.[4] This is particularly true as an inmate has no right to being housed in a particular institution within the prison system. This is discussed more fully below.
 III.
¶ 9 You next ask whether a state of emergency exists under the Act if, for example, medium-level security state prisons are overcrowded, but minimum-level security prisons have an abundance of unoccupied beds.
¶ 10 The Act states that the Department must request the governor to declare an emergency "whenever the population of theprison system exceeds 95% of the capacity" for 30 consecutive days. Use of the word "system" indicates more than an isolated institution or security level. In its everyday sense, (see 25O.S. 1 (1991)); First American Bank and Trust Co. of Purcell v.Oklahoma Industrial Finance Authority, 951 P.2d 625, 631-32
(Okla. 1997)), the word "system" is defined as "a complex unity formed of many often diverse parts subject to a common plan or serving a common purpose"; "a group of devices or artificial objects forming a network or used for a common purpose." Webster's Third New International Dictionary 2322 (1993). This definition is consistent with the statutory description of the Department, "which shall consist of divisions, subdivisions, institutions, and such sections, offices and positions as may be established by the Director, subject to the approval of the Board, or by law." 57 O.S. 505 (1991).
¶ 11 By the plain language of the statute, an emergency under the Act is triggered when the population exceeds 95% throughout the "prison system," not an individual institution or security level.[5] It is therefore possible that conditions at one facility may be less desirable than conditions at another, less crowded facility. However, subject to constitutional limitations, "[t]o the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman,452 U.S. 337, 347 (1981). Therefore, if capacity at one institution exceeds 95%, but the capacity throughout the entire system does not exceed 95%, the provisions of the Act are not triggered.
 IV.
¶ 12 You next ask whether the formula for calculating the population of the prison system adopted by the Board is invalid because it did not comply with notice and filing requirements of the Administrative Procedures Act ("APA"). The answer to this question operates under the assumption you are referring to a resolution passed in 1998 by the Board. That resolution reads:
 Legal Capacity, as used in Title 57 O.S. 571(1) means beds actually available for use by the department including;
 1) department beds including all restrictive housing beds, and administrative segregation beds, and
 2) all beds available under contract from non-departmental entities, private or governmental, which shall NOT include beds used for medical purposes, provided such capacity shall be certified by the board from time to time, and the current certified capacity pursuant to this definition is 21,405.
Minutes of Oklahoma Board of Corrections Meeting, October 29, 1998.
¶ 13 There is nothing in the APA itself indicating legislative intent that the Department be exempt from the APA requirements for promulgating rules. See 75 O.S. 250.4 (1998) (listing agencies exempted from certain provisions of the APA). Nor is there anything within the statutes governing the Department indicating an exemption from the rulemaking requirements of the APA. The determinative issue is whether such a formula constitutes a "rule" under the APA.
¶ 14 "Rule" is defined in the APA as:
 [A]ny agency statement or group of related statements of general applicability and future effect that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of the agency. The term "rule" includes the amendment or revocation of an effective rule but does not include:
. . . .
 c. statements and memoranda concerning only the internal management of an agency and not affecting private rights or procedures available to the public[.]"
75 O.S. 250.3(15) (1998) (emphasis added).
¶ 15 If the formula for calculating the population of the prison system does not affect the private rights of its prisoners or procedures available to the public, it is not a "rule" within the meaning of the APA, and the promulgation requirements of APA do not apply.
 A.
¶ 16 The Oklahoma Supreme Court has answered the question concerning whether the private rights of prisoners are violated by being moved from one facility to another. In Morris v.Meachum, 718 P.2d 1354, 1356 (Okla. 1986), the Court first noted that an inmate "does not have a substantial personal right in the situs of his confinement," relying on Olim v. Wakinekona,461 U.S. 238 (1983). In Olim, a prisoner in Hawaii was transferred to a state prison in California after he was labeled a troublemaker at the conclusion of an administrative hearing. The inmate alleged he had been denied procedural due process. Referring toMeachum v. Fano 427 U.S. 215 (1976), and Montanye v. Haymes427 U.S. 236 (1976), wherein it was held that intrastate prison transfer does not directly implicate the due process clause of the fourteenth amendment, the Olim Court reiterated:
 The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another. The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in any of its prisons.
. . . .
 Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose.
Olim, 461 U.S. at 244-45 (quoting Meachum,427 U.S. at 224-25) (emphasis in original).
¶ 17 After quoting the above, the Oklahoma Supreme Court added:
 Whatever deprivation the convict has experienced by virtue of the change in security status and resultant classification to a more supervised prison environment has not encroached upon his liberty interest. That interest has been extinguished to the point that the state may confine him where it wishes. The prisoner thus has no substantial personal rights in situs of his confinement. Modes of procedure, such as security classification, do not affect matters of sufficient substance to invoke the inhibition against ex post facto laws. These types of discretionary actions have traditionally been the business of prison administrators rather than the courts.
Morris v. Meachum, 718 P.2d at 1356.
¶ 18 Therefore, a decision by the Department to include beds in other facilities does not violate the private rights of prisoners.
¶ 19 Nor does the decision to include private beds in determining capacity deprive an inmate of any right to a good time credit given under the Act. As indicated by its very name, the Oklahoma Prison Overcrowding Emergency Powers Act attempts to deal administratively with the right of an inmate not to be incarcerated in an overcrowded facility, see Barnes v. State,791 P.2d 101, 103 (Okla.Crim. 1990); it only incidentally provides an inmate with additional credits to be used toward his release. Cf. 57 O.S. 138 (1998) (mandating that eligible inmates receive credits under normal prison conditions). We find no indication that the Legislature intended that a policy be defined as a "rule" under the APA if that policy concerns itself with the internal management of an agency and only incidentally and remotely affects an inmate's rights. See Barnes,791 P.2d at 103 (in holding changes to Act were not ex post facto laws, court observed that the Act "is designed to provide the state with an administrative option to alleviate overcrowding in the Oklahoma prison system. Its use is triggered exclusively by the size of the prison population. The size of the prison population cannot be seen to be a consequence attached to the crime Petitioner committed. Rather it is a consequence of the statewide interaction between the convictions and sentences imposed and the prison space available."); see also In re an Assessment Issuedto Leisure Hills Health Care Ctr, 518 N.W.2d 71, 74 (Minn.App. 1994) (nursing home inspection procedures were not rules, as they did not directly affect the procedures available to the public.)
 B.
¶ 20 The next question is whether the authority to calculate a formula affects "procedures available to the public." As noted above, the task of certifying actual available bedspace has been assigned by the Legislature to the Board of Corrections. See 57 O.S. 571(1) (1998). As the procedure was specifically assigned to the Board, it is not one which is "available" to the public.
¶ 21 We must first determine whether an inmate is a member of the "public" for purposes of this phrase. There appears to be no caselaw dealing with this particular aspect of the APA. However, dicta from federal cases indicates there is a distinction between prison inmates and members of the public in general. See, e.g.,Williams v. Greifinger, 97 F.3d 699, 701 (2d Cir. 1996) (In discussing facts surrounding inmate suit concerning policy governing tuberculosis, court noted "[m]oreover, the inmates did not wear masks during their showers or when they met with their attorneys meetings which, at least in the facility at issue in this case, occurred in the prison's visiting room, an area presumably frequented by members of the public."); Florida AutoAuction of Orlando, Inc. v. United States, 74 F.3d 498, 504 (4th Cir. 1996) (discussing state case "holding that a state statute requiring prison and parole officials to keep records of prisoners' habits and deportment and to prepare adequate reports concerning parole candidates did not create a special duty to protect particular members of the public against crimes committed by released prisoners"); White v. United States, 780 F.2d 97,103 (D.C. Cir. 1986) ("It is well-recognized that institutions, such as prisons and mental hospitals, that have custody over dangerous persons have a duty to members of the public to exercise reasonable care to control their inmates or patients.");Safley v. Turner, 777 F.2d 1307, 1310 (8th Cir. 1985) (Discussing Procunier v. Martinez, 416 U.S. 396 (1974) (a case dealing with regulation of inmate mail), noting that the Supreme Court had determined that, because the regulation applied to mail to and from non-inmates as well as inmates, the case did not require "an assessment of the extent to which prisoners may claim First Amendment freedoms but instead could be decided on the basis of incidental restrictions on the rights of members of the general public."); Madison County Jail Inmates v. Thompson,773 F.2d 834, 837 (7th Cir. 1985) (In discussing procedural matters surrounding suit by inmates alleging bad jail conditions, the court noted "the pendency of additional class actions by jail inmates seeking similar injunctive relief and money damages and the fact that the judgment or any settlement would affect not only the interest of the class members but the public interest as well."); Estate of Bailey by Oare v. York County, 768 F.2d 503,511 (3d Cir. 1985) (citing case involving "the murder by the parolee of a member of the public at large five months after he was released from prison"); Madyun v. Franzen, 704 F.2d 954,959 (7th Cir.) (analyzing inmates' free speech rights; noting that Supreme Court in Pell v. Procunier, 417 U.S. 817, 825
(1974), had "applied a less stringent standard to the inmates' claim that the prohibition of interviews with the media violated their right of free speech," even though alternate methods of communication available to inmate would be unimpressive if those alternate methods were submitted as justification for government restriction of personal communication "among members of the general public."); United States v. Tonry, 605 F.2d 144, 151
(5th Cir. 1979) (In upholding a condition of probation that probationer not run for political office or engage in political activity during the period of probation, court commented that "the condition of his probation made it impossible for him, without risking incarceration, to do as a member of the public what he could have done as a prisoner.").
¶ 22 Based on this recognition that inmates at least for some purposes are differentiated from members of the public, it is possible to conclude that inmates are not part of the "public" for purposes of the definition of "rule" in the Act.
¶ 23 But even assuming for purposes of discussion that prisoners were included in the definition of "public," the authority to certify actual available bedspace is more involved with the internal management of the corrections system, and only incidentally or indirectly affects the inmates. Cf.LeisureHills, 518 N.W.2d at 74 (nursing home inspection procedures were not rules, as they did not "directly affect the procedures available to the public."); Service Employees InternationalUnion v. Idaho Department of Health and Welfare, 683 P.2d 404,407 (Idaho 1984) (departmental policy in times of budget cuts to force an employee, who would otherwise be fired, to surrender previously earned merit pay increases in order to take a job at a lower pay and merit level was not a "rule," as it concerned only internal management of the agency, and did not affect private rights or procedures available to the public).
¶ 24 This same rationale applies with even greater force to the non-inmate population of the state. The decision whether to include private beds in the definition of legal capacity simply does not affect the general public: although the public may have an interest that the state run its prisons in an orderly manner,see Sidebottom v. Schiriro, 927 F.Supp. 1221, 1226 (E.D.Mo. 1996) (rights of television station and its reporters were not harmed by prison's decision to stay video interviews with prison inmates), the procedure by which that is accomplished is not available to the general public. Furthermore, it does not affect the general public in that it does not "command the public to do anything, prohibit the public from doing anything[,] declare the rights of the public in any respect, or make any procedures available to the public." Doe v. Chang, 564 P.2d 1271, 1273
(Haw. 1977) (holding an agency manual which sets forth procedures for welfare fraud investigation was not a "rule" under the Hawaii APA). See also State v. Fedak, 825 P.2d 1068, 1070 (Haw.App. 1992) (police policy establishing sobriety roadblock procedures not a "rule," but rather internal guidelines "directed solely toward troopers [which] instruct them as to the manner in which they fulfill their duties."); Crosby v. State Dept. of Budget Finance, 876 P.2d 1300, 1313-14 (Haw. 1994), cert. denied,513 U.S. 1081 (1995) (holding that a circular issued by the state comptroller to other state department heads interpreting what types of contracts "do not admit of competition" under Hawaii statutes was not a "rule" under the Hawaii APA but "simply an internal guideline that the Comptroller or the Government may ignore or not," inasmuch as the circular "was sent only to other state agencies and does not command or prohibit any action by any member of the public or any public employee"). Rather, the method used to certify the capacity of the prison system is an internal management decision following a legislative dictate giving the Department authority to determine capacity of the prison system.
¶ 25 It is, therefore, the official Opinion of the AttorneyGeneral that:
1. Under the Oklahoma Prison Overcrowding Emergency Powers Act,Sections 57 O.S. 570 through 57 O.S. 576 of Title 57,which mandates extra time credits be given toward an earlierrelease under certain conditions, the Department of Correctionshas the power to include beds available under contract or leasefrom private prisons in determining whether a state of emergencyexists in the prison system.
2. In calculating whether an emergency exists under the OklahomaPrison Overcrowding Emergency Powers Act, Sections 570 through576 of Title 57, which mandates extra time credits be giventoward an earlier release under certain conditions, theDepartment of Corrections is allowed to utilize prisoner bedspace in private prisons before completely filling beds withinstate-operated prisons, thereby failing to trigger the Act.
3. If the prison population in a prison facility designated atone level of security exceeds 95 percent of capacity, but theprison population in another facility with a different securitylevel designation does not exceed 95 percent of capacity, a stateof emergency does not exist which would mandate extra timecredits toward early release under the Oklahoma PrisonOvercrowding Emergency Powers Act, Sections 570 through 576 ofTitle 57. The Act concerns itself with inmate capacity throughoutthe entire prison system.
4. The formula used by the Board of Corrections for calculatingthe population of the prison system in order to determine whethera state of emergency exists under the Oklahoma PrisonOvercrowding Emergency Powers Act, Sections 570 through 576 ofTitle 57, is not subject to the notice and filing requirements ofthe Administrative Procedures Act, as the methods used by theBoard of Corrections to define "legal capacity" do not constitute"rules" under the Administrative Procedures Act.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
DAN CONNALLY ASSISTANT ATTORNEY GENERAL
[1] To be eligible for emergency time credits, an inmate must be classified as medium security or less, be incarcerated for a nonviolent offense (as defined in 57 O.S. Supp 1998, § 571[57-571](5)), and not be incarcerated as a second or subsequent offender under sections 51 or 52 of Title 21. See 57 O.S. 1991, § 573[57-573].
[2] A "private prison contractor" is defined as:
 [A] nongovernmental entity or public trust which, pursuant to a contract with the Department of Corrections, operates an institution within the Department, or provides for the housing, care, and control of inmates and performs other functions related to said responsibilities within a minimum or medium security level facility not owned by the Department but operated by the contractor.
57 O.S. Supp. 1998, § 502[57-502](g)(1). A "private prison contractor" has another definition relating to the care of prisons from the federal prison system or other states; however, it is not germane to this discussion.
[3] That statute reads:
 It is the intent of the State Legislature that all new prisoners sentenced to the custody of the Department of Corrections will be processed through the Lexington Assessment and Reception Center or at a place determined by the Director of the Department of Corrections. The Department of Corrections shall administer physical and psychological examinations, inventory vocational skills, and assess educational and training needs. The Department of Corrections shall determine initial security and custody classifications, plan for immediate or possible future assignment to an institution, community treatment center or other alternative to incarceration authorized by law, provide orientation and instruction with respect to rules and procedures for prisoners, and perform other such activities deemed necessary by the Department of Corrections.
[4] In stating this opinion, we are aware of 57 O.S. Supp.1998, § 563[57-563](A), but do not feel it is applicable to the question at hand. That statute provides that "[c]orrectional facilities owned or operated by private prison contractors shall not be deemed to be within the Department of Corrections or other state agency." The entire subsection reads:
 Except as otherwise authorized by 73 O.S. 183,
before and correctional facility other than an inmate work center as authorized in subsection B of this section or an inmate drug offender work camp, whether within the Department of Corrections or within any other state agency, may be created or any construction performed which may significantly increase, extend or expand the present facility, such creation or construction shall be approved by the Legislature. Correctional facilities owned and operated by private prison contractors shall not be deemed to be within the Department of Corrections or other state agency.
Reviewing the statutory language in its entirety reveals that the Legislature intended to restrict the creation of any new state-owned prison facilities, or restrict the expansion of any such existing facilities, without the express approval of the Legislature. The section is not contained in the Oklahoma Prison Overcrowding Emergency Powers Act, but rather is contained in the Oklahoma Corrections Act of 1967. Additionally, to interpret this section as placing a restraint on the ability of the Department to contract with private prison contractors would be contrary to the provisions of 57 O.S. 1991, § 504[57-504](b)(7), which specifically gives the Department the power "[t]o enter into contracts with private prison contractors."
[5] This holding simply states that it is the entire prison system, not individual institutions or security levels within that system, which must exceed 95% of capacity before the provisions of the Act are triggered. An inmate who feels that conditions in an individual institution are unacceptable has the right to initiate judicial proceedings in an appropriate forum — a practice not unknown within the inmate population. See, e.g.,Battle V. Anderson, 564 F.2d 388 (10th Cir. 1977) and its line of related cases.